RECEIVED

FEB 2 3 2006

CLERK U.S. DISTRICT COURT
ANCHORAGE, ALASKA

James F. Vollintine
P.O. Box 113329
Anchorage, AK 99511-3329
(907)346-4446; Fax 346-4898
Email: jfv@alaska.com
Attorney for Plaintiffs

Daniel M. Duame
4000 Old Seward Highway, Suite 202
Anchorage, AK 99503
(907)563-2146; Fax 770-6223
Email: Dand@aleutian-housing.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF AKUTAN DBA AKUTAN TRIBAL COUNCIL and ALEUTIAN HOUSING AUTHORITY,<br><br>    Plaintiffs,<br><br>vs.<br><br>ALPHONSO JACKSON, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, ET AL.,<br><br>    Defendants. | Case No. A05-284 CV (JKS) |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

INTRODUCTION...................................................1
STATEMENT OF FACTS.............................................1
STANDARD OF REVIEW............................................4
SUMMARY OF ARGUMENT...........................................6
ARGUMENT......................................................8

I.   HUD ERRED IN REJECTING AHA AS NVA's CBDO..............8

     a. AHA Is An Eligible CBDO Under
        24 CFR 1003.204(c)(2)(iv)
        And (c)(3) As A Matter of Law.....................8

        1.   AHA Is An Eligible CBDO Under
             24 CFR 1003.204(c)(2)(iv)....................9

        2.   AHA Is Sufficiently Similar to an Entity
             Described In 24 CFR 1003.204(c)(1) or (2)
             To Qualify As A CBDO Under 1003.204(c)(3).....13

        3.   HUD's Interpretation Is Not
             Entitled To Deference........................16

     b. HUD Erred in Determining That NVA Failed to
        Submit Sufficient Evidence Of AHA's CBDO Status....19

     c. HUD Misconstrued Section 103 Of The HUD Reform
        Act of 1989 And Violated 24 CFR 4.26(a)(1) And
        (b)(2) And Section V.B.9.a Of The NOFA By
        Failing To Render Technical Assistance to NVA......22

        1.   Section 103 Of The HUD Reform Act Of 1989......22
        2.   The Regulations..............................25

II.  HUD's FAILURE TO FOLLOW ITS REGULATIONS
     VIOLATED NVA'S DUE PROCESS RIGHTS....................30

III. HUD'S REJECTION OF NVA'S
     APPLICATION WITHOUT NOTICE OR HEARING
     VIOLATED NVA'S DUE PROCESS RIGHTS....................33

     a. Protected Property Interest.......................34

Page

    b. Determining What Process Is Due...................38

        1.   The Private Interest
            Affected By HUD's Actions...................39

        2.   Risk Of Erroneous Deprivation By
            HUD's Procedures And Probable Value
            Of Additional Safeguards....................40

        3.   HUD's Interest And Cost Or Burden on Agency..41

CONCLUSION..............................................43

TABLE OF AUTHORITIES

Cases                                                                    Page

Alaska Chapter, Associated General Contractors of
America v. Pierce, 694 F.2d 1162 (9th Cir. 1982)...............18
Alaska Public Easement Defense Fund v. Andrus,
435 F.Supp. 664 (D. Alaska 1977)...............................5
Alcarez v. I.N.S., 384 F.3d 1150 (9th Cir. 2004)...............30
Alvarado v. State, 486 P.2d 891 (Alaska 1971).................39
American Mfrs. Mut. Ins. Co. v. Sullivan,
526 U.S. 40 (1999)...........................................34
Associated Builders & Contractors of Texas Gulf Coast v.
U.S. Dept. of Energy, 451 F.Supp. 281 (D.C. Tex. 1978).......32
Bayview Hunters Point Community Advocates v.
Metropolitan Transp. Com'n, 366 F.3d 692 (9th Cir. 2004).......16
Berends v. Butz, 357 F.Supp. 143 (D.C. Minn. 1973)............32
Bills v. Henderson, 631 F.2d 1287 (6th Cir. 1980)..............32
Board of Regents v. Roth, 408 U.S. 564 (1972).................35
Broaden v. Harris, 451 F. Supp. 1215 (W.D. Pa. (1978)..........5
Bryan v. Itasca County, 426 U.S. 373 (1976)....................5
Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001)............5,17
Connecticut Department of Social Services v. Leavitt,
428 F.3d 138 (2d Cir. 2005)..................................36
Connecticut State Dept. of Social Services v. Thompson,
242 F.Supp. 2d 127 (D. Conn. 2003)...........................36
Darby v. Cisneros, 509 U.S. 137 (1993)........................33
Davis v. U.S. Dept. of Housing and Urban Development,
627 F.2d 942 (9th Cir. 1980)..............................4,33
Devine v. Cleland, 616 F.2d 1080 (9th Cir. 1980).........34,35,39
Gilbert v. Homar, 520 U.S. 924 (1997).........................37
Goldberg v. Kelley, 397 U.S. 254 (1970)....................35,39
Government of Canal Zone v. Brooks,
427 F.2d 346 (5th Cir. 1970)................................32
Hewitt v. Helms, 459 U.S. 460 (1972)..........................35
Hjelvik v. Babbitt, 198 F.3d 1072 (9th Cir. 1999).............17
HRI, Inc. v. E.P.A., 198 F.3d 1224 (10th Cir. 2000)..........5,17
Jicarilla Apache Tribe v. Supron Energy Corp.,
728 F.2d 1555 (10th Cir. 1984)..............................17
Lal v. I.N.S., 255 F.3d998, 1004 (9th Cir. 2001)............4,17
Matthews v. Eldridge, 424 U.S. 319 (1976)..................35,39
Melkonian v. Ashcroft, 320 F.3d 1061 (9th Cir. 2003).........6,21
Montilla v. I.N.S., 926 F.2d 162 (2d Cir. 1992)...............32
Morton v. Mancari, 417 U.S. 535 (1974).......................18

i

Cases cont'd                                                        Page

Ogle v. Salamatof Native Ass'n, Inc.,
906 F.Supp.1321 (D. Alaska 1995)............................33,39
Oneida County v. Oneida Indian Nation,
470 U.S. 226 (1985).........................................18
Pence v. Kleppe, 529 F.2d 135 (9th Cir. 1976)..........5,17,35,42
Preston v. Heckler, 734 F.2d 1359 (9th Cir. 1984)..............5
Preston v. Schweiker, 555 F.Supp. 886 (D. Alaska 1983)........5
Ramirez-Alejandre v. Ashcroft,
320 F.3d 858 (9th Cir. 2003)..............................34
Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt,
506 F.Supp. 1059 (D.R.I. 1980)..............................5
Sinaloa Lake Owners Ass'n v. City of Simi Valley,
864 F.2d 1475 (9th Cir. 1989)..............................34
Town of Castle Rock, Colo. v. Gonzales, ___U.S.___,
125 S.Ct. 2796 (2005).......................................37
Singh v. I.N.S., 295 F.3d 1037 (9th Cir. 2002)................5
State of California ex rel. Lockyer v. F.E.R.C.,
329 F.3d 700(9th Cir. 2003)...............................33
TRW, Inc. v. F.T.C., 647 F.2d 942 (9th Cir. 1981)............31
Tyonek Native Corporation v. Secretary of the Interior,
836 F.2d 1237 (9th Cir. 1988)............................18
United States v. Cacares, 440 U.S. 741 (1979)................31
United States v. Jim, 409 U.S. 80 (1972)....................30
Wards Cove Packing Corp. v. National Marine Fisheries
Service, 307 F.3d 1214 (9th Cir. 2002)....................5,17
Weiler v. U.S., 364 F.Supp.2d 1057
(D. Alaska 2005)........................4,6,16,17,21,30
Williams v. Armontrout, 852 F.2d 377 (8th Cir. 1988),
cert. denied, 488 U.S.996 (1988)............................37


Constitutions
United States Constitution, Amend. V....................30,33


Statutes
5 U.S.C. 701-706.............................................4
25 U.S.C. 4103(16)..........................................10
25 U.S.C. 4103(21)(B)(ii)...................................10
42 U.S.C. 3537a........................................3,7,22,32
42 U.S.C. 3537a(a)..........................................22
42 U.S.C. 3537a(e)(3).......................................24
42 U.S.C. 3537a(e)(6).......................................24
42 U.S.C. 3537a(f)..........................................23
42 U.S.C. 5301...............................................2
42 U.S.C. 5306(a)(1)......................................2,36
AS 18.55.995................................................39

Statutes cont'd                                                    Page

AS 18.55.996.........................................9,13,15,19
AS 18.55.996(b).........................................10,11

Legislative Materials
1989 U.S. Code, Cong. and Adm. News 1465-1(Dec. 15, 1989)....23

Rules and Administrative Materials
24 CFR Part 4, Subpart B.................................25,28
24 CFR 4.20.................................................25
24 CFR 4.26........................................20,25,26,29
24 CFR 4.26(a)(1).............................7,26,27,28,31,41
24 CFR 4.26(b)(2)...............................7,26,28,31,41
24 CFR 1003.204(a)...........................................8
24 CFR 1003.204(c)......................................passim
24 CFR 1003.301(b).......................................29,38
24 CFR 1003.303.............................................38
Notice of Funding Availability, 70 Fed. Reg. 13654
(Mar. 21, 2005).........................................passim
HUD's PowerPoint Presentation.......................11,12,19,22

Other Authorities
Black's Law Dictionary (6th ed. 1990).......................11
Charles H. Koch, Jr., Administrative Law and Practice,
 Second, (1997)......................................35,36,37

STATUTES AND REGULATIONS

**Section 103 of HUD Reform Act of 1989, 42 U.S.C.A. § 3537a (Prohibition of advance disclosure of funding decisions):**
(a) Prohibited actions
During any selection process, no officer or employee of the Department of Housing and Urban Development shall knowingly disclose any covered selection information regarding such selection, directly or indirectly, to any person other than a person authorized by the Secretary to receive such information.

(e) Definitions
For purposes of this section:
(1) Applicant
The term "applicant" means any applicant or candidate that is being considered for receiving assistance.
(2) Assistance
The term "assistance" means any grant, loan, subsidy, guarantee, or other financial assistance under a program administered by the Secretary that provides by statute, regulation, or otherwise for the competitive distribution of such assistance. The term does not include any mortgage insurance provided under a program administered by the Secretary.
(3) Covered selection information
The term "covered selection information" means--
(A) any information that is contained in any application or request for assistance, or any information regarding the decision of the Secretary to make
available assistance or other information that is determined by the Secretary to be information that is not generally available to the public (not including program requirements and timing of the decision to make assistance available); and
(B) any information that is required by statute, regulation, or order to be confidential.
(4) Knowingly
The term "knowingly" means having actual knowledge of or acting with deliberate ignorance of or reckless disregard for the prohibitions under this section.
(5) Selection
The term "selection" means the determination of which applicants for assistance are to receive assistance under the program.
(6) Selection process
The term "selection process" means the period with respect to a selection for assistance that begins with the development, preparation, and issuance of a solicitation or request for applications for the assistance and concludes with the selection

of recipients of assistance, and includes the evaluation of applications.

(f) Regulations

The Secretary shall issue such regulations as the Secretary deems appropriate to implement this section.

(g) Applicability

This section shall apply only with respect to violations that occur on or after December 15, 1989.

## Regulations-Section 103 of HUD Reform Act of 1989
## 24 CFR 4.26: Permissible and impermissible disclosures.

(a) Notwithstanding the provisions of Section 103, an employee is permitted to disclose information during the selection process with respect to:

(1) The requirements of a HUD program or programs, including unpublished policy statements and the provision of technical assistance concerning program requirements, provided that the requirements or statements are disclosed on a uniform basis to any applicant or potential applicant. For purposes of this part, the term "technical assistance" includes such activities as explaining and responding to questions about program regulations, defining terms in an application package, and providing other forms of technical guidance that may be described in a NOFA. The term "technical assistance" also includes identification of those parts of an application that need substantive improvement, but this term does not include advising the applicant how to make those improvements.

(2) The dates by which particular decisions in the selection process will be made;

(3) Any information which has been published in the Federal Register in a NOFA or otherwise;

(4) Any information which has been made public through means other than the Federal Register;

(5) An official audit, inquiry or investigation, if the disclosure is made to an auditor or investigator authorized by the HUD Inspector General to conduct the audit or investigation;

(6) Legal activities, including litigation, if the disclosure is made to an attorney who is representing or is otherwise responsible to the Department in connection with the activities; or

(7) Procedures that are required to be performed to process an application, e.g., environmental or budget reviews, and technical assistance from experts in fields who are regularly employed by other government agencies, provided that the agency with which the expert is employed or associated is not an applicant for HUD assistance during the pending funding cycle.

v



(b) An authorized employee, during the selection process, may
contact an applicant for the purpose of:
(1) Communication of the applicant's failure to qualify, after a
preliminary review for eligibility and completeness with respect
to his or her application, and the reasons for the failure to
qualify, or the fact of the applicant's failure to be determined
to be technically acceptable after a full review; or
(2) Clarification of the terms of the applicant's application. A
clarification, for the purpose of this paragraph (b), may
include a request for additional information consistent with
regulatory requirements.
(c) Prohibition of advance disclosure of funding decisions.
During the selection process an employee shall not knowingly
disclose any covered selection information regarding the
selection process to any person other than an employee
authorized to receive that information.
(1) The following disclosures of information are, at any time
during the selection process, a violation of Section 103:
(i) Information regarding any applicant's relative standing;
(ii) The amount of assistance requested by any applicant;
(iii) Any information contained in an application;
(2) The following disclosures of information, before the
deadline for the submission of applications, shall be a
violation of Section 103:
(i) The identity of any applicant; and
(ii) The number of applicants.

**Housing and Community Development Act of 1974, as amended.
42 U.S.C.A. § 5301:**

Congressional findings and declaration of purpose:
(a) Critical social, economic, and environmental problems facing
Nation's urban communities.
The Congress finds and declares that the Nation's cities, towns,
and smaller urban communities face critical social, economic,
and environmental problems arising in significant measure from--
(1) the growth of population in metropolitan and other urban
areas, and the concentration of persons of lower income in
central cities;
(2) inadequate public and private investment and reinvestment in
housing and other physical facilities, and related public and
social services, resulting in the growth and persistence of
urban slums and blight and the marked deterioration of the
quality of the urban environment; and
(3) increasing energy costs which have seriously undermined the
quality and overall effectiveness of local community and housing
development activities.

(b) Establishment and maintenance of viable urban communities;
systematic and sustained action by Federal, State, and local
governments; expansion of and continuity in Federal assistance;
increased private investment; streamlining programs and
improvement of functioning of agencies; action to address
consequences of scarce fuel supplies. . . .

**42 U.S.C. 5303:** The Secretary is authorized to make grants to
States, units of general local government, and Indian tribes to
carry out activities in accordance with the provisions of this
chapter.

**42 U.S.C. 5306(a)(1):** For each fiscal year, of the amount
approved in appropriation Acts under section 5303 of this title
for grants for such fiscal year (excluding the amounts provided
for use in accordance with section 5307 of this title), the
Secretary shall reserve for grants to Indian tribes 1 percent of
the amount appropriated under such section. The Secretary shall
provide for distribution of amounts under this paragraph to
Indian tribes on the basis of a competition conducted pursuant
to specific criteria for the selection of Indian tribes to
receive such amounts. The criteria shall be contained in a
regulation promulgated by the Secretary after notice and public
comment. Notwithstanding any other provision of this Act, such
grants to Indian tribes shall not be subject to the requirements
of section 5304 of this title, except subsections (f), (g), and
(k) of such section.

**Regulations-Indian Community Development Block Grant Program
24 CFR Part 1003**
*§ 1003.1    Applicability and scope.*
The policies and procedures described in this part apply to
grants to eligible applicants under the Community Development
Block Grant (CDBG) program for Indian tribes and Alaska native
villages.
*§ 1003.2    Program objective.*
The primary objective of the Indian CDBG (ICDBG) Program and of
the community development program of each grantee covered under
the Act is the development of viable Indian and Alaska native
communities, including decent housing, a suitable living
environment, and economic opportunities, principally for persons
of low and moderate income. The Federal assistance provided in
this part is not to be used to reduce substantially the amount
of tribal financial support for community development activities
below the level of such support before the availability of this
assistance.

§ 1003.204   *Special activities by Community-Based Development Organizations (CBDOs).* . . .

(c) *Eligible CBDOs.* (1) A CBDO qualifying under this section is an organization which has the following characteristics:

(i) Is an association or corporation organized under State or local law to engage in community development activities (which may include housing and economic development activities) primarily within an identified geographic area of operation within the jurisdiction of the grantee; and

(ii) Has as its primary purpose the improvement of the physical, economic or social environment of its geographic area of operation by addressing one or more critical problems of the area, with particular attention to the needs of persons of low and moderate income; and

(iii) May be either non-profit or for-profit, provided any monetary profits to its shareholders or members must be only incidental to its operations; and

(iv) Maintains at least 51 percent of its governing body's membership for low- and moderate-income residents of its geographic area of operation, owners or senior officers of private establishments and other institutions located in and serving its geographic area of operation, or representatives of low- and moderate-income neighborhood organizations located in its geographic area of operation; and

(v) Is not an agency or instrumentality of the grantee and does not permit more than one-third of the membership of its governing body to be appointed by, or to consist of, elected or other public officials or employees or officials of an ineligible entity (even though such persons may be otherwise qualified under paragraph (c)(1)(iv) of this section); and

(vi) Except as otherwise authorized in paragraph (c)(1)(v) of this section, requires the members of its governing body to be nominated and approved by the general membership of the organization, or by its permanent governing body; and

(vii) Is not subject to requirements under which its assets revert to the grantee upon dissolution; and

(viii) Is free to contract for goods and services from vendors of its own choosing.

(2) A CBDO that does not meet the criteria in paragraph (c)(1) of this section may also qualify as an eligible entity under this section if it meets one of the following requirements:

(i) Is an entity organized pursuant to section 301(d) of the Small Business Investment Act of 1958 (15 U.S.C. 681(d)), including those which are profit making; or

(ii) Is an SBA-approved Section 501 State Development Company or Section 502 Local Development Company, or an SBA Certified

Section 503 Company under the Small Business Investment Act of
1958, as amended; or
(iii) Is a Community Housing Development Organization (CHDO)
under 24 CFR 92.2, designated as a CHDO by the HOME Investment
Partnerships program participating jurisdiction, with a
geographic area of operation of no more than one neighborhood,
and has received HOME funds under 24 CFR 92.300 or is expected
to receive HOME funds as described in and documented in
accordance with 24 CFR 92.300(e); or
(iv) Is a tribal-based nonprofit organization. Such
organizations are associations or corporations duly organized to
promote and undertake community development activities on a not-
for-profit basis within an identified service area.
(3) A CBDO that does not qualify under paragraphs (c)(1) or (2)
of this section may also be determined to qualify as an eligible
entity under this section if the grantee demonstrates to the
satisfaction of HUD, through the provision of information
regarding the organization's charter and by-laws, that the
organization is sufficiently similar in purpose, function, and
scope to those entities qualifying under paragraphs (c)(1) or
(2) of this section.

### AS 18.55.995 Purpose and intent.
The legislature finds that an acute shortage of housing and
related facilities exists in the villages of the state and that
adequate housing cannot be provided by the private sector due to
the economic depression that exists in most villages of the
state. It is the purpose and intent of the legislature to
provide a means for certain Native associations to form public
corporations with the powers and duties comparable to those
provided in AS 18.55.100 -- 18.55.960.

### AS 18.55.996 Creation of authorities.
(a) The following associations are given the authority specified
in (b) of this section:
(1) Arctic Slope Native Association (Barrow and Point Hope);
(2) Kawerak, Inc. (Seward Peninsula, Unalakleet, St. Lawrence
Island);
(3) Northwest Alaska Native Association (Kotzebue);
(4) Association of Village Council Presidents (southwest coast
of Alaska including all villages in the Bethel area and all
villages on the Lower Yukon River and Lower Kuskokwim River);
(5) Tanana Chiefs Conference (Koyukuk, the middle and upper
Yukon River villages, and the upper Kuskokwim and Tanana River
villages);
(6) Cook Inlet Tribal Council (Kenai, Tyonek, Eklutna, and
Seldovia);

ix

(7) Bristol Bay Native Association (Dillingham, Upper Alaska Peninsula);
(8) Aleut League (Aleutian Islands, Pribilof Islands, and that part of the Alaska Peninsula that is in the Aleut League);
(9) North Pacific Rim Native Corp. (Cordova, Tatitlek, Port Graham, English Bay, Valdez, Seward, Eyak, and Chenega);
(10) Tlingit-Haida Central Council or Alaska Native Brotherhood (Southeastern Alaska);
(11) Kodiak Area Native Association (all villages on and around Kodiak Island);
(12) Copper River Native Association (Copper Center, Glennallen, Chitina, and Mentasta);
(13) Alaska Federation of Natives, Inc.;
(14) Sitka Community Association (Baranof and Japonski Island);
(15) Metlakatla Indian Community (Metlakatla);
(16) Ketchikan Indian Corporation (Ketchikan area, excluding Saxman).
(b) There is created with respect to each of the associations named in (a) of this section a public body corporate and politic to function in the operating area of the individual associations to be known as the regional housing authority of the associations possessing all powers, rights, and functions now or subsequently specified under AS 18.55.100 -- 18.55.290, except those specified with respect to the construction and acquisition of public buildings for lease to the state or any authority that is inconsistent with AS 18.55.995. A regional housing authority may enter into agreements with local government, other political subdivisions of the state, the state or the federal government for the exercise of a function or power relating to construction, operation, and maintenance of public facilities or public utilities. Upon execution of an agreement and for the period of the agreement the regional housing authority shall have the same powers and functions relating to the subject matter of the agreement as those that may legally be exercised by the governmental unit with whom the agreement is made including the authority to separately or together with the other unit borrow money and issue notes, bonds, or other evidence of indebtedness to finance a project within the scope of the agreement subject to the express limitations, if any, contained in the agreement. All obligations or liabilities of the regional housing authority shall remain their own and are not obligations or liabilities of the state. . . .

x

INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 16.3(c) of the United States District Court for the District of Alaska, the plaintiffs, Native Village of Akutan dba Akutan Tribal Council ("NVA") and Aleutian Housing Authority ("AHA"), hereby move that the Court enter summary judgment in their favor on the ground that no genuine issue exists concerning any material fact and that they are entitled to judgment as a matter of law.

The plaintiffs respectfully request that the Court (1) reverse HUD's rejection of NVA's application for a grant under the FY 2005 Indian Community Development Block Grant ("ICDBG") program as unsupported by substantial evidence and contrary to law, (2) declare that AHA is an eligible Community-Based Development Organization ("CBDO") under 24 CFR 1003.204(c) as a matter of law, and (3) remand this case to HUD with directions to continue processing NVA's application. This motion is based on the pleadings and memorandum of law, affidavit and exhibits filed herewith.

STATEMENT OF FACTS

On March 21, 2005 the United States Department of Housing and Urban Development ("HUD") issued a Notice of Funding Availability ("NOFA"), 70 Fed. Reg. 13654 (R.71), under Title I

of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. 5301 *et seq.*[1] The NOFA invites Indian tribes to apply for grants to build housing and other community facilities for tribal members.[2]

On August 25, 2005 NVA filed an ICDBG application with HUD's Alaska Office of Native American Programs ("ONAP") (R.513-577). The application seeks a $500,000 grant to build a 4-plex in Akutan for low- and moderate-income tribal members. NVA designated AHA as its Community-Based Development Organization ("CBDO") under 24 CFR 1003.204(c) to carry out the project (R.523, 545). HUD did not reach the merits of NVA's application or notify it of any alleged problems. On November 2, 2005 defendant Donna Hartley summarily denied it, stating that AHA did not meet the requirements for a CBDO under 24 CFR 1003.204(c) (R.812). Ms. Hartley's decision included a copy of HUD's written review and comments on its analysis of why it determined that AHA did not qualify as a CBDO (R.816-17). Ms.

[1] A 1989 amendment, 42 U.S.C. 5306(a)(1), added Indian tribes as grantees of federal assistance along with States and municipalities, and directed HUD to adopt regulations providing for the distribution of funds to tribes on a competitive basis. HUD adopted the ICDBG regulations in 24 CFR Part 1003 to implement this provision.
[2] The NOFA states that $6,807,990 is available for Alaska's tribes (R.74), and a total of 39 applied. Area ONAP summarily rejected some applications, and rated and ranked the remainder in descending order of priority, eventually distributing the money mostly in $500,000 increments to the top 17 applicants (Ex.A-5).

Hartley's decision was issued without prior notice, and NVA was given no opportunity to clarify its application, submit additional information or arguments, correct the alleged deficiency, or otherwise dispute the decision.

NVA promptly requested reconsideration. NVA alleged that the decision violated the regulations and its due process rights, and requested a hearing or opportunity to submit additional information (R.818-23). On November 23, 2005 defendant Wayne Mundy, in Ms. Hartley's absence, denied the request (R.824). Mr. Mundy reiterated that NVA failed to submit sufficient documentation to establish that AHA qualified as a CBDO, that the HUD Reform Act of 1989, 42 U.S.C. 3537a, prevented HUD from contacting NVA during the application process, that Ms. Hartley's decision was not "subject to claims of error," and that under the NOFA and regulations NVA had no administrative remedies. Mr. Mundy did not address NVA's due process arguments.

The plaintiffs then filed this action alleging that HUD erred in rejecting AHA as NVA's CBDO, denying NVA's application without prior notice and hearing, and without seeking clarification or providing an opportunity to correct the application as required by the regulations. The parties stipulated to resolve the plaintiffs' motion for temporary restraining order and preliminary injunction by HUD setting

aside $500,000 in excess funds from the FY 2004 funding cycle until September 30, 2006 to satisfy NVA's application should it prevail on the merits of this action and in further proceedings before HUD.

The plaintiffs seek a declaration that HUD's decision is unsupported by substantial evidence, contrary to law and unconstitutional, and that AHA qualifies as a CBDO as a matter of law under 24 CFR 1003.204(c), together with a remand to HUD requiring it to process NVA's application on its merits.

## STANDARD OF REVIEW

Agency action is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. 701-706. <u>Davis v. U.S. Dept. of Housing and Urban Development</u>, 627 F.2d 942, 945-46 (9th Cir. 1980). Under 5 U.S.C. 706 the Court should "hold unlawful and set aside" agency action that is "unsupported by substantial evidence," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law," or "contrary to constitutional right."

An agency is required to follow its own regulations, and its interpretation is entitled to deference if not plainly erroneous or inconsistent with the regulations. <u>Wieler v. U.S.</u>, 364 F.Supp.2d 1057, 1062 (D. Alaska 2005). "[T]he plain meaning of a regulation governs and deference to an agency's

1  interpretation of its regulation is warranted only when the
2  regulation's language is ambiguous." Wards Cove Packing Corp.
3  v. National Marine Fisheries Service, 307 F.3d 1214, 1219 (9th
4
5  Cir. 2002); Lal v. I.N.S., 255 F.3d 998, 1004 (9th Cir. 2001).

6       Statutes and regulations relating to Indian tribes should
7  be liberally construed in their favor. Pence v. Kleppe, 529
8  F.2d 135 (9th Cir. 1976); Cobell v. Norton, 240 F.3d 1081, 1103
9
10  (D.C. Cir. 2001); HRI, Inc. v. E.P.A., 198 F.3d 1224, 1245 (10th
11  Cir. 2000). Ambiguities and doubtful expressions should be
12  resolved in favor of tribes. Bryan v. Itasca County, 426 U.S.
13  373, 392 (1976); Alaska Public Easement Defense Fund v. Andrus,
14  435 F. Supp. 664, 671 (D. Alaska 1977).
15
16       An agency decision is an abuse of discretion or arbitrary
17  and capricious if it fails to consider relevant factors, or is
18  based on an improper understanding of law or misinterpretation
19  of a regulation. Preston v. Schweiker, 555 F. Supp. 886, 892
20  (D. Alaska 1983), aff'd sub nom., Preston v. Heckler, 734 F.2d
21
22  1359 (9th Cir. 1984); Broaden v. Harris, 451 F.Supp. 1215, 1225
23  (W.D. Pa. 1978); Robert E. Derecktor of Rhode Island, Inc. v.
24  Goldschmidt, 506 F. Supp. 1059, 1063 (D.R.I. 1980). An agency
25  decision will be reversed if it is arbitrary, irrational or
26  contrary to law. Singh v. I.N.S., 295 F.3d 1037, 1039 (9th Cir.
27
28  2002).
29

1    Agency factual findings are reviewed under the

2  "substantial evidence" standard. Substantial evidence is "such

3  relevant evidence as a reasonable mind might accept as adequate

4

5  to support a conclusion." Weiler v. U.S., 364 F.Supp.2d at

6  1061. An agency's factual findings will be sustained only "if

7  supported by reasonable, substantial and probative evidence in

8  the record." Melkonian v. Ashcroft, 320 F.3d 1061, 1065 (9th

9  Cir. 2003).

10

11                        SUMMARY OF ARGUMENT

12    AHA qualifies as a CBDO as a matter of law under 24 CFR

13  1003.204(c)(2)(iv)and/or (c)(3). In addition, the record

14  clearly shows that HUD erred in determining that NVA failed to

15

16  submit sufficient evidence of AHA's CBDO status. HUD's

17  interpretation and application of the applicable regulations

18  and the NOFA are contrary to the plain language of both and not

19  entitled to deference. Additionally, no deference is required

20  because HUD owes trust responsibilities to NVA and doubts and

21

22  ambiguities in the regulations should be construed in its

23  favor.

24    If the Court holds that AHA qualifies as a matter of law

25  as NVA's CBDO under either 24 CFR 1003.204(c)(2)(iv) or (c)(3),

26

27  there is no need for the Court to consider the remaining issues

28  herein, and this case should be remanded to HUD with directions

29  to adjudicate NVA's ICDBG application on its merits.

1  Alternatively, if HUD was correct in its finding that

2  NVA's application failed to provide sufficient information for

3  HUD to determine AHA's CBDO status, HUD plainly erred in

4  
5  determining that Section 103 of the HUD Reform Act of 1989, 42

6  U.S.C. 3537a, barred it from contacting NVA and giving it an

7  opportunity to submit additional information.  HUD also

8  violated Section V.B.9.a of the NOFA and 24 CFR 4.26(a)(1) and

9  
10  (b)(2) by failing to render technical assistance to NVA and by

11  failing to request non-substantive information which would have

12  allowed the application to then be rated and ranked. Requesting

13  NVA to submit additional information on AHA's CBDO status would

14  not have resulted in a "substantive improvement" to NVA's

15  
16  application, and HUD's summary rejection was arbitrary,

17  capricious and an abuse of discretion.

18  Assuming *arguendo* that clarifying AHA's CBDO status would

19  have resulted in a substantive improvement, under the

20  regulations HUD was permitted to identify those parts that

21  
22  needed substantive improvement and should have allowed NVA to

23  submit additional information to cure the problem.

24  HUD staff and the reviewers were obviously confused

25  regarding the distinction that the regulations make between

26  
27  allowing communications regarding the *existence of defects* in

28  the application, especially as to perceived non-substantive

29  defects – communications which are allowed – and providing

1 information to applicants on *how to correct or remedy*

2 *substantive defects* – communications which are not allowed. At

3
4 a minimum, HUD was required to seek clarification of the

5 application on a non-substantive threshold issue and allow NVA

6 to submit additional information. HUD erred in viewing AHA's

7 CBDO status as a substantive issue.

8 Finally, HUD's failure to follow its regulations and its

9
10 summary rejection of NVA's application without prior notice and

11 hearing violated NVA's due process rights.

12                                  ARGUMENT

13 I.    HUD ERRED IN REJECTING AHA AS NVA's CBDO.

14
15        a.    AHA Is An Eligible CBDO Under 24 CFR 1003.204
             (c)(2)(iv) And (c)(3) As A Matter Of Law.

16 Under 24 CFR 1003.204(a) and Sec. IV(E)(1)(d) of the NOFA

17 (R.79) in order for an Indian tribe to be eligible for new

18
19 housing construction funds under the Indian Community

20 Development Block Grant ("ICDBG") program, it is required to

21 partner with a "Community-Based Development Organization"

22 ("CBDO").

23
24      24 CFR 1003.204(c) sets forth the definitional criteria

25 that an entity must meet to qualify as a CBDO.  The criteria

26 are relatively broad and inclusive and include a whole host of

27 potential eligible entities.  The objective of this requirement

28 seems to be to limit funding to those organizations that have

29

Plaintiffs' Motion for Summary Judgment        8

1  an established track record for carrying out community

2  development projects, including housing renovation or new

3  development.  AHA has been building and renovating homes and

4

5  other facilities for over 30 years, primarily with funding

6  provided through HUD (R.569). Plaintiffs assert that as a

7  matter of law, AHA meets the eligibility criteria of, or is

8  sufficiently similar to, several types of organizations

9  described in 24 CFR 1003.204(c), and that it sufficiently

10

11 alleged such eligibility in its application (R.556) and

12 provided the necessary documentation.

13      1.    AHA Is An Eligible CBDO Under 24 CFR
              1003.204(c)(2)(iv).
14

15      24 CFR 1003.204(c)(2)(iv) provides as follows:

16           (2) A CBDO that does not meet the criteria
             in paragraph (c)(1) of this section may also
17           qualify as an eligible entity under this
             section if it meets *one* of the following
18           requirements:
             . . . .
19
             (iv)    Is    a   tribal-based   nonprofit
20           organization.    Such   organizations   are
             associations or corporations duly organized
21           to    promote    and   undertake   community
             development activities on a not-for-profit
22           basis  within  an  identified  service area.
             (Emphasis added.)
23

24

25 An examination of AHA's charter (AS 18.55.996) and Bylaws

26 (R.560) shows that AHA is a tribal-based nonprofit organization

27 created to build housing for tribal members in Native villages

28

29

within an identified service area, and thus meets the letter
and intent of the regulation.

First, AHA is plainly "tribal-based." Under AS 18.55.996(b)
it was formed as a "regional *Native* (i.e., "tribally based")
housing authority" to provide housing for tribal members in
Native villages.  Under its Bylaws and as a matter of practice,
AHA's 5 appointed board commissioners have always been tribal
members from its service delivery region. (R. 560, Ex.A-2).
Moreover, AHA is NVA's "Tribally-Designated Housing Authority"
under section 4(21)(B)(ii) of the Native American Housing
Assistance and Self-Determination Act (NAHASDA), 25 U.S.C.
4103(21)(B)(ii) (R.534). In that AHA was statutorily-created as
a "Native" housing organization, is run by tribal members,
provides housing services solely for tribal members and other
eligible Native Americans, and acts on behalf of the tribe in
housing matters, it must be deemed a "tribal-based" entity as a
matter of law.

Second, AHA clearly is a "nonprofit organization" under the
regulation. The term "nonprofit" applies to a wide variety of
entities organized for purposes other than generating profit.
For example, section 4(16) of NAHASDA, 25 U.S.C. 4103(16),
provides that:

> The term "nonprofit" means, with respect to
> an organization, association, corporation,
> or other entity, that no part of the net

> earnings of the entity inures to the benefit of any member, founder, contributor, or individual. (Emphasis added.)

See also, Black's Law Dictionary, p.1056 (6th ed. 1990)(definition of "non-profit association"). Under AS 18.55.996(b) AHA is a "*public* body corporate" and hence a nonprofit organization because no part of its net earnings inure to the benefit of any member, founder, contributor or individual.

Finally, tracking the regulation, AHA was "duly organized to promote and undertake community development activities on a not-for-profit basis within an identified service area." Under AS 18.55.996(b) its purpose is to build housing for tribal members in Native villages, a purpose which clearly qualifies as "community development activities." Further, under AS 18.55.996(b) it operates within "an identified service area" because it is organized to "function in the operating area of the individual [regional] associations..." i.e. within the Aleutian/Pribilof Islands region.

Moreover, HUD's training guidelines for ICDBG applicants state that tribes may designate regional housing authorities as CBDOs. In its annual training for the FY 2005 funding cycle for prospective ICDBG grantees, HUD discussed the CBDO eligibility issue and showed a PowerPoint presentation (Ex.C). AHA had a

staff person attend this training (Ex.A-4). One slide states

that those wanting to demonstrate eligibility under the

"sufficiently similar" criteria of 24 CFR 1003.204(c)(3) should

do so "through submission of information regarding the

*organization's charter and bylaws*, that it is sufficiently

similar in purpose, function and scope to entities [described

in (c)(1) or (2)]" (Ex.C-3). The next slide (Ex.C-3)

specifically states that ICDBG applicants may designate

Regional Housing Authorities (RHA) as CBDOs under

204(c)(2)(iv):

> Applicant may assert that an RHA is an
> eligible CBDO as being sufficiently similar
> to Tribally-based CD Non-profit.
> Documentation should include:
> • Narrative Statement addressing
> -How it is tribally based (how, when, why &
> by whom created.
> -Show how those that created it are linked
> to by custom, tradition, geography etc.
> (Emphasis added.)

NVA provided this precise information by submitting its charter

(R.557), Bylaws (R.560), and a Narrative Statement (R.556), yet

HUD deemed it insufficient. Accordingly, HUD also violated its

own training guidelines in rejecting AHA as NVA's CBDO.

2.  AHA Is Sufficiently Similar To An Entity
    Described In 24 CFR  1003.204(c)(1) Or(2)
    To Qualify As A CBDO Under 1003.204(c)(3).

Regulation 24 CFR 1003.204(c)(3) provides a sort of "catch

all" for entities that might not technically have all the

various "characteristics" of 1003.204(c)(1) and (2), but are

"sufficiently similar in purpose, function and scope":

> (3)  A  CBDO  that  does  not  qualify  under
> paragraphs  (c)(1)  or  (2)  of  this  section  may
> also be determined to qualify as an eligible
> entity  under  this  section  if  the  grantee
> demonstrates  to  the  satisfaction  of  HUD,
> through  the  provision  of  information
> regarding the organization's charter and by-
> laws, that the organization is sufficiently
> similar in purpose, function, and scope to
> those entities qualifying under paragraphs
> (c)(1)  or  (2)  of  this  section.  (Emphasis
> added.)

NVA contends that under 204(c)(3) AHA is not only "sufficiently

similar" it is "substantially similar" in purpose function and

scope to a (c)(1) or (2) entity.

First, AHA substantially qualifies as a CBDO under the 8

criteria listed in 204(c)(1). Under AS 18.55.996 it is a

nonprofit association organized under State law with a defined

geographic area of operation that includes NVA's area of

jurisdiction. AHA's 5-member board of commissioners consists of

tribal members appointed by the regional Native nonprofit

association, and its purpose is to provide housing for low- and

moderate-income tribal members in Native villages.

HUD's reviewer pointed out that the composition of AHA's board of commissioners might not meet the specific criteria of 204(c)(1) (R.817). NVA does not dispute that AHA's bylaws in existence at the time of filing the application did not include all criteria of this section due to one or two very minor omissions in the bylaws' language on board member eligibility (R.560). The practical reality, however, is that as a matter of practice, i.e., the way board members are actually appointed, AHA has in fact always met the criteria of 204(c)(1), and in fact, AHA amended its bylaws recently in a manner which would eliminate any confusion about whether it might meet the requirements of this subsection (Ex.A-2). The bylaws changes were made for purposes totally unrelated to this action and in any case are irrelevant, as NVA makes no claim that AHA meets the precise criteria of (c)(1), but that under (c)(3) it is sufficiently similar to a (c)(1) entity to qualify as a CBDO.

Second, NVA contends that under (c)(3) AHA is "sufficiently similar" if not identical to a "tribal-based nonprofit organization" described in (c)(2)(iv). This provision has already been discussed in Part I.a.1 above where the plaintiffs argue that AHA qualifies as a CBDO under it. If AHA does not meet the precise qualifications of a (c)(2)(iv) entity

it is certainly "sufficiently similar" to one to qualify for CBDO status.

As recently as December 23, 2005 HUD recognized the Bristol Bay Housing Authority (BBHA) as a CBDO for Levelock Village Council, an Indian tribe, under "24 CFR 1003.204(c)(3)" (R.1024,1027,1089). BBHA is a statutorily-created Regional Native Housing Authority identical to AHA. Just like AHA it is organized under AS 18.55.996, its 5-member board of commissioners consists of tribal members chosen by the regional Native association, the regional Native association's members are the tribes in the region; and its board of directors consists of a representative from each tribe.[3] Under AS 18.55.996 the statutorily-created charters, purposes, functions and authorized activities are identical for Bristol Bay Housing Authority, Aleutian Housing Authority and all statutorily-created housing authorities. We submit that it was arbitrary and capricious for HUD to recognize one regional housing authority as a CBDO and then reject an identical entity as one. The Court should hold as a matter of law that HUD's recognition of BBHA as a CBDO is recognition that all regional housing authorities qualify as CBDOs for tribes.

_____

[3] BBHA's Bylaws are attached as Exhibit B and are essentially identical to AHA's (R.560). BBHA's bylaws lack the same criteria that HUD found wanting in AHA's (R.817).

In summary, AHA qualifies as a CBDO under 24 CFR 1003.204(c)(3) because it is substantially similar to a (c)(1) or (c)(2)(iv) entity. Given its statutory purpose, history and scope of activities, it was plainly unreasonable for HUD to determine that under (c)(3) AHA is not "sufficiently similar in purpose, function, and scope to those entities qualifying under paragraphs (c)(1) or (2)," or that it could not make this determination from the information provided as part of NVA's application.

3. HUD's Interpretation Is Not Entitled To Deference.

"A regulation should be construed to give effect to the natural and plain meaning of its words." Wieler v. U.S., 364 F.Supp.2d 1057, 1063 (D. Alaska 1985)(Department of Interior's interpretation of regulation consistent with its plain meaning), citing Bayview Hunters Point Community Advocates v. Metropolitan Transp. Com'n, 366 F.3d 692, 698 (9th Cir. 2004). NVA contends that HUD's interpretation of 24 CFR 1003.204(c) not to recognize AHA as a CBDO is not entitled to deference because it is "plainly erroneous or inconsistent with the regulation." Id. at 1062-23.

First, the language in 24 CFR 1003.204(c)(2)(iv) and (3) is clear. "[T]he plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted only when the regulation's language is ambiguous."

1   Wards Cove Packing Corp. v. National Marine Fisheries Service,

2   307 F.3d 1214, 1219 (9th Cir. 2002) (agency position contrary to

3   plain language of regulation is invalid); Lal v. I.N.S., 255

4
5   F.3d 998, 1004 (9th Cir. 2001) (court need not defer to agency

6   interpretation if alternative reading is compelled by

7   regulation's plain language).

8       NVA submits that because AHA qualifies as a CBDO under the

9
10  plain language of the regulations, HUD's contrary position is

11  "arbitrary, capricious, not supported by substantial evidence,

12  or contrary to law." Weiler v. U.S., 364 F. Supp.2d at 1061,

13  citing Hjelvik v. Babbitt, 198 F.3d 1072, 1074 (9th Cir. 1999).

14      Assuming arguendo that HUD's interpretation is entitled to

15
16  deference, the court is faced with conflicting canons of

17  statutory construction because of the rule that statutes and

18  regulations benefiting Native Americans should be liberally

19  construed in their favor.[4] In Tyonek Native Corporation v.

20

21  ――――――――――――――――――――――――――――――――――
    [4] See, e.g., Pence v. Kleppe, 529 F.2d 135, 140 (9th Cir. 1976)
22  ("statutes passed for the benefit of dependent Indian tribes
    and communities are to be liberally construed in favor of the
23  Indians"). This interpretive rule applies to federal
    regulations as well. "The trust relationship and its
24  application to all federal agencies that may deal with Indians
25  necessarily requires the application of a similar canon of
    construction to the interpretation of federal regulations."
26  HRI, Inc. v. E.P.A., 198 F.3d 1224, 1245 (10th Cir. 2000).
27  "[W]henever doubt or ambiguity exists in federal statutes or
    regulations, such doubt is resolved in favor of the tribes."
28  Cobell v. Norton, 240 F.3d 1081, 1103 (D.C. Cir. 2001), citing
    Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555,
29  1563 (10th Cir. 1984) modified en banc 782 F.2d 855 (10th Cir.

1   Secretary of the Interior, 836 F.2d 1237, 1239 (9th Cir. 1988),

2   the court noted that it need not "determine the appropriate

3   balance between these conflicting canons," because it found

4

5   that the agency's interpretation was contrary to ANCSA.

6      NVA submits that in this case the canon of statutory

7   construction favoring Natives trumps the agency deference rule.

8   HUD owes trust responsibilities to NVA and is required to

9

10  liberally construe the regulations by resolving doubts and

11  ambiguities in its favor, and may certainly not disadvantage it

12  without substantial reason.

13     In summary, AHA clearly qualifies as a CBDO under the

14  plain language of 24 CFR 1003.204(c)(2)(iv) as a "tribal-based

15

16  nonprofit organization," and under 204(c)(3) as "sufficiently

17  similar" to a (c)(1) or (2) entity, and HUD clearly had

18  sufficient evidence available for review – not to mention its

19  institutional knowledge of a 30-year relationship with AHA – to

20  make this determination.  If the Court holds that AHA qualifies

21

22  as a CBDO as a matter of law, its inquiry need go no further

23

24  1986).  This rule is an aspect of the special trust relationship
    between the Federal Government and Indian tribes.  Oneida County
25  v. Oneida Indian Nation, 470 U.S. 226, 247 (1985); Morton v.
26  Mancari, 417 U.S. 535, 555 (1974).  In upholding HUD's Indian
    preference regulation the Ninth Circuit stated that "Alaska
27  Natives are under the guardianship of the federal government
    and entitled to the benefits of the special relationship."
28  Alaska Chapter, Associated General Contractors of America v.
29  Pierce, 694 F.2d 1162, 1168-69 n.10 (9th Cir. 1982).

Plaintiffs' Motion for Summary Judgment    18

and it must find in favor of plaintiffs and order HUD to review NVA's application on its merits.

### b. HUD Erred In Determining That NVA Failed To Submit Sufficient Evidence Of AHA's CBDO Status.

HUD's November 23, 2005 denial of NVA's request for reconsideration states that NVA failed to provide sufficient documentation that AHA qualifies as a CBDO (R.825):

> The NOFA at Section III.C.4.c(1) specifies that the applicant "must provide documentation establishing that the entity implementing [the applicant's] new housing construction project qualifies as a CBDO." NVA did not. (Underlining added.)

NVA submits that this decision is unsupported by substantial evidence and contrary to law.

HUD clearly erred in finding that NVA failed to provide sufficient information. The documents required for a CBDO eligibility determination, *and requested by* HUD in its training guidelines (Ex.C-3) to make its CBDO determination under 24 CFR 1003.204(c), were submitted with NVA's application and consist of a Narrative Statement describing AHA's history, purpose and scope of activities, copies of AS 18.55.996 (AHA's charter) and AHA's Bylaws (R.555-67).  NVA should not be penalized because HUD either failed to carefully read the documents, interpret AS

18.55.996 and the regulations, or make the necessary connection
between NVA's submittals and the regulations.[5]

HUD's reviewer seemed to indicate that AHA could be
rejected as a CDBO because NVA failed to specifically state the
section of 24 CFR 1003.204(c) under which AHA qualified as a
CBDO (R.817). Neither the regulations nor the NOFA have any
such requirement.

In any case, the reviewer did in fact go on to analyze the
various sections under which eligibility might be established
and concluded that there was insufficient information to
determine AHA's eligibility. As noted above, this conclusion
is clearly not supported by the record.

As to subsection 204(c)(2)(iv) (the section providing for
eligibility as a "tribal-based non-profit organization") the
rater stated: "In 1003.24(3)(c)(2)(i)[sic], it provides for a
number of entities to be considered eligible as a CBDO. AHA
does not provide documentation showing evidence that it is any
of the eligible entities listed under this section" (R.817).
AHA is at a loss to understand the basis of this statement
given the documentation that was in fact submitted and is in

---

[5] As noted in Part I.c.2, *infra*, if HUD believed that it needed
more information on AHA's CBDO status it erred in failing to
request it from NVA under 24 CFR 4.26.

1  the record at R.555-67 (i.e., narrative statement, organic

2  statute/charter and bylaws).

3
4     The reviewer goes on to state (R.817): "Based on rater's
5  review of the documentation submitted, it [sic] could not find
6  sufficient evidence that the CBDO was similar in purpose,
7  function and scope to those entities qualifying under
8  paragraphs (c)(1) or (2) of Part 1003.24(c) [sic]. Therefore,
9
10 the rater could not determine that AHA qualifies as an eligible
11 CBDO." Again, this conclusion is simply inexplicable and not a
12 reasonable statement given the record before the court.

13    HUD's factual findings are thus unsupported by substantial
14 evidence because they are not based on "such relevant evidence
15
16 as a reasonable mind might accept as adequate to support a
17 conclusion," Wieler v. U.S., 364 F.Supp.2d at 1061, nor are
18 they "supported by reasonable, substantial and probative
19 evidence in the record," Melkonian v. Ashcroft, 320 F.3d 1061,
20
21 1065 (9th Cir. 2003).

22    In addition, it was plainly arbitrary and capricious for
23 HUD to treat AHA as if it were some alien, unknown entity
24 unsuited to act as a CBDO. It was patently unreasonable for it
25 to claim ignorance of AHA's "purpose, function and scope."
26
27 Given HUD's intimate familiarity and contracts with AHA for the
28 past 30 years, and considering that it just recognized an
29 identical housing authority as a CBDO (R.1024,1027,1089), and

1  where NVA's application included all information required by 24

2  CFR 1003.204(c) and HUD's PowerPoint presentation, we submit

3  that HUD abused its discretion in rejecting AHA as NVA's CBDO.

4

5      As previously noted, if the Court agrees with the analysis

6  presented above, it need not consider this matter further, but

7  must rule in plaintiffs' favor and grant the appropriate

8  relief, as requested.  There are however, additional HUD

9  violations to consider, if the above does not provide a

10

11  sufficient basis to resolve this case.

12      c.   HUD  Misconstrued  Section  103  of  the  HUD
           Reform  Act  of  1989  And  Violated  24  CFR
13          4.26(a)(1)And(b)(2) And  Section V.B.9.a Of
           The  NOFA  By  Failing  To  Render  Technical
14          Assistance To NVA.

15

16      1.   Section 103 Of The HUD Reform Act Of 1989.

17      HUD's November 23, 2005 decision states that NVA failed to

18  submit sufficient evidence for HUD to determine whether AHA

19  qualified as a CBDO, and that HUD was precluded from contacting

20  NVA for more information because it is barred by Section 103 of
21
22  the Department of Housing and Urban Development Reform Act of

23  1989, 42 U.S.C. 3537a, from "contacting and coaching applicants

24  in substantive improvements to the application" (R.825).  NVA

25  submits that HUD misconstrued the Act and violated the

26  regulations adopted to implement it.
27

28      Section 103(a) of the HUD Reform Act, 42 U.S.C. 3537a(a),

29  prohibits HUD employees from disclosing any "covered selection

information" during the selection process to unauthorized

persons. "Covered selection information" is defined as:

> (A) any information that is contained in any
> application or request for assistance, or
> any information regarding the decision of
> the Secretary to make available assistance
> or other information that is determined by
> the Secretary to be information that is not
> generally available to the public (not
> including program requirements and timing of
> the decision to make assistance available);
> and
> (B) any information that is required by
> statute, regulation, or order to be
> confidential.

42 U.S.C. 3537a(e)(3). The Act provides civil and criminal

penalties for disclosing such information and directs HUD to

adopt regulations to implement it. 42 U.S.C. 3537a(f).

As President Bush explained:

> This legislation is intended to help
> eliminate the systemic flaws that have
> allowed a number of Housing and Urban
> Development (HUD) programs to be abused for
> political purposes or personal gain at the
> expense of those in need. H.R. 1 will
> improve program management and financial
> accountability at HUD and make that
> Department's programs less susceptible to
> waste, fraud, abuse, and political
> influence.

1989 U.S. Code, Cong. and Adm. News 1465-1 (Dec. 15, 1989).

Thus, the purpose of the Act is not to prevent HUD from

assisting applicants, but to prevent "waste, fraud, abuse and

political influence" in the administration of its programs by

providing a competitive application process and prohibiting advance disclosure of funding decisions.

There are no reported cases construing Section 103. The plain language of 42 U.S.C. 3537a(e)(3) shows that the prohibited "covered selection information" is narrowly defined to prevent HUD from disclosing to applicants (1) information that is contained in other applications, (2) advance information regarding HUD's decision to make assistance available, (3) other information not generally available to the public, and (4) information that is confidential by law. The statute expressly authorizes HUD to disclose information regarding program requirements and the timing of its decisions.

Section 103 prohibits "advance disclosure of funding decisions" and the release of "covered selection information." Based on the plain language of 42 U.S.C. 3537a(e)(3) HUD is free to disclose information that is not "covered selection information" including information regarding program requirements. This leaves a lot of room for it to provide technical assistance to applicants during the "selection process," which means the period that begins with the development and preparation of a NOFA "and concludes with the selection of recipients of assistance, and includes the evaluation of applications." 42 U.S.C. 3537a(e)(6).

Here, notifying NVA of a problem in its application and allowing it to submit additional information would not have resulted in the disclosure of "covered selection information" in violation of Section 103. Instead, it would have constituted disclosure of program requirements as expressly authorized by the statute, and the provision of technical assistance as required by the regulations.

2.    The Regulations.

24 CFR Part 4, Subpart B - "Prohibition of Advance Disclosure of Funding Decisions" - sets forth a framework that establishes both "permissible and impermissible disclosures" and contacts with applicants under Section 103 of the HUD Reform Act of 1989. This framework is in essence written into the NOFA.  The purpose of the regulations is to preclude giving an unfair advantage to applicants who might receive some information that other applicants would not, thereby improving their grant score based on pre-established rating factors.  See 24 CFR 4.20 (Purpose).  As demonstrated below, however, neither the statute, regulations or the NOFA require or anticipate an absolute bar on pre-award contacts as HUD held below (R.825); in fact, the opposite is the case.

24 CFR 4.26 recognizes that there is a need for communication with applicants during the selection process, and sets forth a framework for HUD to respond to inquiries from

applicants, and for HUD to *initiate* contacts, where issues may arise on an application that need clarification or where HUD may need more information--precisely the kind of issues involved with NVA's application.

24 CFR 4.26 provides in part as follows:

> (a) Notwithstanding the provisions of Section 103, an employee is permitted to disclose information during the selection process with respect to:
> (1) The requirements of a HUD program or programs, including unpublished policy statements and the provision of technical assistance concerning program requirements, provided that the requirements or statements are disclosed on a uniform basis to any applicant or potential applicant. For purposes of this part, the term "technical assistance" includes such activities as explaining and responding to questions about program regulations, defining terms in an application package, and providing other forms of technical guidance that may be described in a NOFA. The term "technical assistance" also includes identification of those parts of an application that need substantive improvement, but this term does not include advising the applicant how to make those improvements. (Emphasis added.)
>
> (b) An authorized employee, during the selection process, may contact an applicant for the purpose of:
> . . . .
>
> (2) Clarification of the terms of the applicant's application. A clarification, for the purpose of this paragraph (b), may include a request for additional information consistent with the regulatory requirements. (Emphasis added.)

Section V.B.9.a of the NOFA states (R.87):

> B.9. Technical Deficiencies and Pre-Award Requirements. a. *Technical Deficiencies*: * * * HUD may not seek clarification of items or responses that improve the substantive quality of your response to any rating factor. In order not to unreasonably exclude applications from being rated and ranked, HUD may contact applicants to ensure proper completion of the application and will do so on a uniform basis for all applicants. (Emphasis added.)

HUD determined in its review that NVA failed to submit sufficient evidence that AHA is a CBDO and that this was grounds for summary rejection of its application because under the HUD Reform Act HUD "is prohibited from contacting and coaching applicants in substantive improvements to the application" (R.825). (Emphasis added.) HUD was only partially correct.

Although HUD may not contact and coach applicants on *how to make* substantive improvements, it is not prohibited from notifying applicants that part of an application *may need* substantive improvements. Thus, HUD committed an error of law because 24 CFR 4.26(a)(1) expressly states that "technical assistance" includes notifying an applicant "of those parts of an application that need substantive improvement," even though HUD may not advise how to make the improvement.

Assuming *arguendo* that NVA had a chance to provide additional information regarding its CBDO status, it is important to recognize that this would still not have resulted

in a "substantive improvement" to its application, because CBDO status is merely a threshold issue an applicant must meet to get its application scored and ranked.   There are no points given for being an eligible CDBO.   It is this fact that makes HUD's summary rejection of NVA's application particularly unreasonable and egregious.

HUD included in the Administrative Record a November 29, 2005 opinion of its General Counsel entitled "Guidelines for Assisting Grant Applicants" (R.308). The brief opinion does not discuss or even mention the regulations in 24 CFR Part 4.[6] It states that HUD's goal in assisting applicants "is to provide responsive, helpful information to the maximum extent possible without violating the HUD Reform Act or any other applicable ethics statute or regulation" (R.309). It then states that while HUD "can provide information to help applicants comply with the application *process*," it "cannot advise or assist applicants with the *substantive contents* of their applications" (R.308-09). (Italics in original.)

Although HUD cannot advise the applicant on how to make a needed substantive improvement, the opinion fails to recognize,

---

[6] HUD included two other General Counsel opinions on Section 103 (R.303, 306) that are also unhelpful because they discuss the statute while ignoring the regulations that were adopted to implement it. There is no mention of 24 CFR 4.26(a)(1) and (b) and other relevant regulations in any of the three opinions.

1  or simply does not address, HUD's authority to initiate

2  discussions regarding a non-substantive threshold deficiency,

3  if it perceives it to exist, and allow the problem to be

4
5  remedied.  As stated earlier, CBDO status is not a "rating

6  factor" under the NOFA; no points are awarded to a tribe for

7  having a CBDO (R.80-88).[7] NVA would have gained no unfair

8  competitive advantage by HUD contacting it, which is what the

9
10 statute and regulations are designed to prevent. In short,

11 there was no legal impediment to HUD requesting information

12 from NVA under 24 CFR 4.26 and section V.B.9.a of the NOFA and

13 allowing it to submit additional information on AHA's CBDO

14 status.

15
16      These regulations go to the heart of the plaintiffs'

17 complaint. As noted above, HUD held that the HUD Reform Act

18 legally barred it from contacting NVA regarding a substantive

19 improvement (R.825). Most critically for this particular case,

20 HUD may seek "clarification" of an application and make "a

21
22 request for additional information," and "may contact

23 applicants to ensure proper completion of the application" so

24 as not to "unreasonably exclude applications from being rated

25 and ranked." HUD clearly erred as a matter of law in

26
27
28 [7] 24 CFR 1003.301(b) states that the NOFAs "are to describe how
   point awards will be made." The rating factors are summarized
29 in HUD's PowerPoint presentation (R.325).

determining that the HUD Reform Act precluded it from contacting NVA for clarification or additional information on a non-substantive, threshold matter because the regulations expressly authorize it to do just that.

"It is well established that an agency must follow its own published regulations." Wieler v. U.S., supra, 364 F.Supp.2d at 1062, citing Alcaraz v. I.N.S., 384 F.3d 1150, 1162 (9th Cir. 2004). NVA's situation was precisely the type of situation contemplated in the regulations and NOFA which HUD violated by failing to contact NVA for additional information. HUD had a duty not to "unreasonably exclude [NVA's application] from being rated and ranked." NOFA V.B.9(a) (R.87-88). HUD's decision not to contact NVA is particularly egregious in a process with no reconsideration or appeal rights. As argued in part III hereof, the lack of due process built into the system also creates a constitutional flaw in the ICDBG program.

II. HUD's FAILURE TO FOLLOW ITS REGULATIONS
VIOLATED NVA'S DUE PROCESS RIGHTS.

The Fifth Amendment to the United States Constitution provides in part that "No person shall be...deprived of life, liberty or property without due process of law..." Indian tribes are entitled to the protections of the Due Process Clause. E.g., United States v. Jim, 409 U.S. 80, 87 (1972).

1    As noted above, HUD violated 24 CFR 1003.204(c) by

2    rejecting AHA as NVA's CBDO, and the NOFA and 24 CFR 4.26(a)(1)

3    and (b)(2) by rejecting NVA's application without notice,

4

5    without seeking clarification, and without allowing NVA an

6    opportunity to correct it. NVA submits that HUD's failure to

7    follow its regulations violated its due process rights.

8         The Due Process Clause is implicated where "an individual

9    has reasonably relied on agency regulations promulgated for his

10

11   guidance and benefit and has suffered substantially because of

12   their violation by the agency." TRW, Inc. v. F.T.C., 647 F.2d

13   942, 953 (9th Cir. 1981), citing United States v. Cacares, 440

14   U.S. 741, 753 (1979). In TRW the court found no due process

15

16   violation because the petitioners "received a full and

17   procedurally correct adjudicative hearing," and any agency

18   error was "purely one of form." Id. In Cacares there was no

19   violation because the defendant had not relied on the

20

21   regulation that he claimed the agency failed to follow.

22        Here the plaintiffs reasonably relied on the regulations

23   in question—24 CFR 1003.204(c) for AHA's CBDO status, and the

24   NOFA and 24 CFR 4.26(a)(1) and (b)(2) to correct NVA's

25   application. Although NVA did not specifically mention 24 CFR

26

27   4.26(a)(1) and (b)(2) in its Request for Reconsideration, it

28   did rely on Section V.B.9.a of the NOFA which purports to

29   incorporate them (R.87, 820). Also, in denying reconsideration

HUD cited Section 103 of the HUD Reform Act of 1989, 42 U.S.C.
3537a, as foreclosing it from contacting NVA during the
application process (R.825). The latter regulations were
adopted to implement the Act and contradict HUD's position.

Federal courts have long held that failure of an
administrative agency to follow its own established procedures
constitutes a violation of procedural due process. In Montilla
v. I.N.S., 926 F.2d 162 (2d Cir. 1992), the court stated that
"[t]he notion of fair play animating [the Due Process Clause]
precludes an agency from promulgating a regulation affecting
individual liberty or interest, which the rule-maker may then
with impunity ignore or disregard as it sees fit." See also
Berends v. Butz, 357 F. Supp. 143, 151 (D.C. Minn. 1973); Bills
v. Henderson, 631 F.2d 1287, 1299 (6th Cir. 1980); Government of
Canal Zone v. Brooks, 427 F.2d 346, 347 (5th Cir. 1970);
Associated Builders & contractors of Texas Gulf Coast, Inc. v.
U.S. Dept. of Energy, 451 F. Supp. 281, 286 (D.C. Tex. 1978).
Here NVA reasonably relied on the regulations and substantially
suffered as a result of their violation. Accordingly, HUD
violated its due process rights.

### III. HUD'S REJECTION OF NVA'S APPLICATION WITHOUT NOTICE OR HEARING VIOLATED NVA'S DUE PROCESS RIGHTS.

NVA also asserts that HUD's summary rejection of its application without notice or hearing violated its due process rights. HUD ignored NVA's due process arguments (R.822), yet noted that the tribe had no administrative remedies (R.825). [8] NVA submits that the ICDBG Program and HUD's administration thereof are constitutionally flawed and violated its right to due process of law under the Fifth Amendment.

The crux of procedural due process is notice and an opportunity to be heard. Ogle v. Salamatof Native Ass'n, Inc., 906 F.Supp. 1321, 1328 (D. Alaska 1995)(ANCSA section 14(c) claimant has constitutionally-protected interest in land application). Courts assess the adequacy of procedural due process on a case-by-case basis, based on the total circumstances. State of California ex rel. Lockyer v. F.E.R.C., 329 F.3d 700, 711 (9th Cir. 2003) (expedited application process did not violate due process). In deciding whether agency

---

[8] Section V.B.10 of the NOFA states that HUD Area ONAP decisions on ICDBG applications under 24 CFR Part 1003 "are not subject to claims of error" (R.88). The ICDBG regulations clearly lack administrative reconsideration or appeal rights from Area ONAP's rejection of an application. In Davis v. HUD, 627 F.2d 942, 945 (9th Cir. 1980), the court noted that there are no express administrative remedies to exhaust in the Housing and Community Development Act and regulations. See also, Darby v. Cisneros, 509 U.S. 137, 153 (1993)(official's decision is "final agency action" under the APA where neither statute or regulation mandate further administrative appeals).

procedures comport with due process the court does not defer to the agency. Ramirez-Alejandre v. Ashcroft, 320 F.3d 858, 869 (9th Cir. 2003). [9]

Deciding a due process claim is a two-step analysis. The court should first determine whether the claimant's interest is a "property interest" protected by the Due Process Clause, and, if so, ascertain what process is due. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 57 (1999); Devine v. Cleland, 616 F.2d 1080, 1085-86 (9th Cir. 1980).

a. Protected Property Interest. NVA submits that it has a protected property interest in its application under the Housing and Community Development Act and ICDBG regulations. Courts have rejected the distinction between rights and privileges that once guided procedural due process analysis. The issue is whether the claimant has a "legitimate claim of entitlement" to the government benefit rather than a mere "abstract need or desire" or "unilateral expectation":

---

[9] Only in "extraordinary circumstances" involving a necessity of quick action or the impracticality of a hearing may the Government dispense with a hearing prior to the deprivation of a protected property interest. "The Supreme Court has repeatedly held that summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 864 F.2d 1475, 1482 (9th Cir. 1989)(Government's destruction of lake without notice in absence of emergency violated homeowners' due process rights). No extraordinary circumstances exist here.

> To have a property interest in a benefit, a
> person clearly must have more than an
> abstract need or desire for it. He must have
> more than unilateral expectation of it. He
> must, instead, have a legitimate claim of
> entitlement to it. . .
>
> Property interests, of course, are not
> created by the Constitution. Rather, they
> are created and their dimensions are defined
> by existing rules or understandings that
> stem from an independent source such as
> state law—rules or understandings that
> secure certain benefits and that support
> claims of entitlement of those benefits.

Board of Regents v. Roth, 408 U.S. 564, 577(1972)(no legitimate

claim of entitlement to continued employment where plaintiff

had only "unilateral expectation" under appointment terms).

Protected property interests must stem from an

"independent source" sometimes denominated a "substantive

predicate." *E.g.*, Hewitt v. Helms, 459 U.S. 460, 472 (1983).

Independent sources include, *inter alia*, statutes or

regulations that create reasonable expectations and inhibit

administrative discretion. Charles H. Koch, Jr., Administrative

Law and Practice (Second), Sec. 2.22 (1997).

For example, in the seminal case of Goldberg v. Kelley,

397 U.S. 254 (1970), the United States Supreme Court held that

welfare applicants, whose right to apply for benefits was

statutorily-based, had protected property interests that

entitled them to evidentiary hearings before denial of

assistance. In Pence v. Kleppe, 529 F.2d 135, 140 (9th Cir.

1   1976), the Ninth Circuit held that Alaska Natives had protected
2   property interests in their land applications under the
3
4   Allotment Act and were entitled to prior notice and hearing
5   before rejection of the applications. See also, Matthews v.
6   Eldridge, 424 U.S. 319, 335 (1976) (right to hearing before
7   termination of social security benefits); Devine v. Cleland,
8   616 F.2d at 1086)(veterans' statutory entitlement to
9
10  educational assistance allowance is "property right" protected
11  by due process).[10]

12          There is no question that NVA has a protected
13  property interest in the right to apply for the funds under 42
14  U.S.C. 5306(a)(1) and 24 CFR Part 1003. It has a "legitimate
15
16  claim of entitlement" to compete fairly for the funds under the
17  regulations, not a mere abstract need or desire or unilateral
18  expectation. Professor Koch notes that administrative
19  regulations that are not merely procedural may provide the
20
21  necessary independent source or substantive predicate to
22  support a due process claim; if the regulation establishes a
23  "substantive criteria" it is "a clear mandatory limit on
24  discretion." Administrative Law and Practice (Second), Sec.
25

26  _____
[10] See also, Connecticut State Dept. of Social Services v.
27  Thompson, 242 F.Supp.2d 127, 155 (D. Conn. 2003)(medicare
    claimants have legitimate claim of entitlement to benefits, not
28  mere "abstract need or desire"), rev'd sub nom. on other
    grounds, Connecticut Department of Social Services v. Leavitt,
29  428 F.3d 138, 147-48 (2d Cir. 2005).

2.22, p.89, citing Williams v. Armontrout, 852 F.2d 377, 379

(8th Cir. 1988), cert. denied, 488 U.S. 996 (1988).

In discussing Supreme Court cases Professor Koch states:

> [F]or an expectation to be more than
> unilateral, the law. . . must require a
> government body to meet some standard before
> depriving an individual of benefits. A
> standard as vague as "good cause" may be
> sufficient to raise the sort of expectation
> needed to activate the due process
> protection. The justification for this
> approach seems practically sound. If the law
> requires an agency or other government body
> to apply any standard in order to take a
> certain action then the affected individual
> has a right to whatever procedures will
> ensure that the agency correctly applies the
> standard. If. . . the agency has unfettered
> discretion so that it can take the action
> without applying any designated standard,
> then no due process rights would be
> required. This makes sense because if there
> is no standard to apply than a hearing
> cannot be of any use. If no specific
> judgment is necessary to support the action,
> then a hearing would serve no purpose; there
> would be nothing to contest at the hearing.

Id. at Sec. 2.21, pp. 78-79. (Citations omitted, emphasis
added.) See Id., 2005-06 Supp. at Sec. 2.22[1]: "a due process
interest is created where there is some substantive limitation
on official discretion," citing Gilbert v. Homar, 520 U.S. 924,
933 (1997). "[A] benefit is not a protected entitlement if
government officials may grant or deny it in their discretion."
Town of Castle Rock, Colo. v. Gonzales, ___U.S.___, 125 S.Ct.
2796, 2803 (2005).

1    Here HUD does not have unfettered discretion to reject

2   NVA's application and in adjudicating it must follow specific

3   standards set out in the regulations. Under 24 CFR 1003.204(c)

4
5   it must determine whether tribal applicants for new construction

6   funding have a suitable CBDO. Under 1003.301(b) it must rate and

7   rank each qualifying ICDBG application: "NOFAs will define and

8   establish weights for the selection criteria, will specify the

9
10   maximum points available, and will describe how point awards

11   will be made." See Sec. V of the NOFA (R.80-88). In the rating

12   process in 24 CFR 1003.303 HUD must evaluate each applicant's

13   capacity, need, soundness, leveraging of resources,

14   comprehensiveness and coordination. Id. Thus, NVA has a specific

15
16   right under the regulations to have its application rated and

17   ranked according to specific standards that limit HUD's

18   discretion. Accordingly, it has a property interest in its

19   application that is protected by the Due Process Clause.

20
       b. Determining What Process is Due. This Court has
21
22   stated:

23            An  agency  may  not  deprive  a  person  of
              property without some kind of hearing. The
24            kind  of  hearing  that  due  process  requires
              generally  involves  consideration  of  three
25            factors:  First,  the  private  interest  that
              will  be  affected  by  the  official  action;
26            second, the risk of an erroneous deprivation
27            of  such  interest  through  the  procedures
              used, and the probable value, if any, of
28            additional     or     substitute     procedural
              safeguards;  and  third,  the  agency's
29

                    interest, including the function involved
                    and the fiscal and administrative burdens
                    that the additional or substitute procedural
                    requirements would entail.

Ogle v. Salamatof, 906 F. Supp. at 1327 n.6, citing Matthews v.

Eldridge and Goldberg v. Kelly. Analysis of these factors shows

that HUD erred in denying NVA's application without prior notice

and hearing.

    1. The Private Interest Affected By HUD's Action. NVA

applied for a $500,000 grant to build housing for tribal members

in Akutan village. NVA's interest in receiving the grant is

great. There is no question of the dire need for decent housing

in Akutan and Native villages in general. As the Alaska

Legislature stated in AS 18.55.995:

                    The legislature finds that an acute shortage
                    of housing and related facilities exists in
                    the villages of the state and that adequate
                    housing cannot be provided by the private
                    sector due to the economic depression that
                    exists in most villages of the state.

See also Alvarado v. State, 486 P.2d 891, 900 (Alaska 1971)

(discussing poverty in Native villages). Plaintiffs submit that

decent housing is as important a need as the welfare, social

security and educational benefits at issue in Goldberg, Eldridge

and Devine.

    NVA's substantial investment in the application process

should also be considered. As indicated in its lengthy

application (R.513-577), major planning and preparation are

1  involved. Under 24 CFR 1003.204(c) and 303 it must coordinate

2  with an eligible CBDO, prepare and file a lengthy application,

3
4  and demonstrate adequate administrative capacity, need,

5  soundness, leveraging of resources, comprehensiveness and

6  coordination. Other funds must be leveraged that remain in limbo

7  during the application process. (The $500,000 sought by NVA is

8  only part of the $1,200,000 needed for the housing project

9
10  (R.551)). NVA thus invests substantial time and resources in the

11  application process, which is another factor militating against

12  arbitrary rejection by HUD.

13    2. Risk Of Erroneous Deprivation By HUD's Procedures And

14  Probable Value Of Additional Procedural Safeguards. HUD's

15
16  procedures create a high risk of deprivation because there is no

17  opportunity to correct an application or HUD's legal and factual

18  errors. As Section V.B.10 of the NOFA states (R.88):

19        "Error and Appeals. Judgments made within
20        the provisions of this Program NOFA and the
          program regulations (24 CFR part 1003) are
21        not subject to claims of error. You may
22        bring arithmetic errors in the rating and
          ranking of applications to the attention of
23        the Area ONAP within 30 days of being
          informed of your score." (Emphasis added.)
24
25  As demonstrated by this case, rejecting ICDBG applicants without

26  notice, hearing, or opportunity to correct error creates an

27  extremely high risk of property deprivation.

28

29

The immense value of additional safeguards is clear: correction of mistakes by both HUD and NVA, prevention of property deprivation, and the exercise of HUD's trust responsibilities to Indian tribes. Fairness and accuracy are dominant goals of administrative law. An administrative process that fails to allow for the correction of an application or agency error is repugnant to traditional notions of justice and fair play underlying the Due Process Clause. As pointed out above, the NOFA and 24 CFR 4.26(a)(1) and (b)(2) expressly authorize HUD to elicit further information from ICDBG applicants, and permit them to submit additional information and correct their applications before HUD issues a final decision, but HUD decided that the HUD Reform Act barred it from contacting NVA during the application process (R.825).

3. HUD's Interest And Cost Or Burden On Agency. NVA submits that it would not have been unduly costly or burdensome for HUD to contact NVA and request verbal clarification of its application, and permit it to submit additional information, or give it some kind of hearing before rejecting its application. The former actions are expressly authorized by Sec. V.B.9.a of the NOFA (R.87) and 24 CFR 4.26(a)(1) and (b)(2), which HUD failed to follow. HUD cannot argue that it is too costly or burdensome to comply with its own regulations.

1  Moreover, plaintiffs submit that the regulations do not

2  satisfy due process because they are permissive, not mandatory,

3  and do not allow an applicant to contest HUD's factual and

4
5  legal findings before it rejects an application. The ICDBG

6  regulations provide no reconsideration or appeal rights. Under

7  the terms of the NOFA HUD's judgment is "not subject to claims

8  of error" (R.88). This is a statement that its determination of

9
10  all legal and factual issues is subject to its sole discretion

11  and beyond challenge by the applicant in the administrative

12  process. This system violates both general principles of

13  administrative law and NVA's due process rights.

14
15  Here HUD claimed it "could not find sufficient evidence"

16  that AHA qualified as a CBDO (R.817). Affording NVA a brief

17  hearing to submit additional evidence and arguments before

18  rejecting its application would not have been unduly costly or

19  burdensome. As noted above, the courts have long required

20  agencies to follow these procedures even where huge numbers of
21
22  applicants were involved. For example, in Pence v. Kleppe,

23  supra, more than 8,500 allotment applications were involved.

24  Here only 39 ICDBG applications were filed with Area ONAP for

25  FY 2005 (Ex.A-5). Further, any delay would only minimally
26
27  interfere with distribution of funds to successful applicants,

28  because HUD could simply withhold enough to satisfy the

29  applications under review, and distribute the rest. Only a few

applicants at the bottom of HUD's ranking list would be affected by a delay.

### CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court grant their motion for summary judgment.

DATED February _23_, 2006.

James F. Vollintine
Attorney for Plaintiff

Daniel M. Duame
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**
I hereby certify that on February
_23_, 2006 a copy of this document
(Plaintiffs' Motion for Summary Judgment)
was hand-delivered to:
Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave.,#9,Rm.253
Anchorage, AK 99513-7567

James Vollintine