DEBORAH M. SMITH
Acting United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
Email: richard.pomeroy@usdoj.gov

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF AKUTAN dba AKUTAN TRIBAL COUNCIL and ALEUTIAN HOUSING AUTHORITY, <br><br> Plaintiffs, <br><br> v. <br><br> ALPHONSO JACKSON SECRETARY OF HOUSING AND URBAN DEVELOPMENT; WAYNE MUNDY, ADMINISTRATOR, ALASKA OFFICE OF NATIVE AMERICAN PROGRAMS, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and DONNA HARTLEY, DIRECTOR GRANTS MANAGEMENT DIVISION, ALASKA OFFICE OF NATIVE AMERICAN PROGRAMS, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br> Defendants. | Case No. 3:05-cv-284-RRB <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 16.3(c)(2) of

the United States District Court for the District of Alaska, the defendants, Alphonso Jackson,

Secretary of Housing and Urban Development; Wayne Mundy, Administrator, Alaska Office of

Native American Programs, United States Department of Housing and Urban Development; and

Donna Hartley, Director, Grants Management Division, Alaska Office of Native American

Programs, United States Department of Housing and Urban Development (hereinafter referred to

collectively as "HUD" or "defendants"), by and through counsel, submit the following

Defendants' Opposition to Plaintiffs' Motion For Summary Judgment in the above-entitled and

numbered cause of action and request that the Court deny plaintiffs' motion and dismiss this

action.

## STATEMENT OF FACTS

On or about August 25, 2005, plaintiff Native Village of Akutan ("NVA") filed an application (Administrative Record, pp. 513-577, hereinafter "R.") in response to a Notice of Funding Availability ("NOFA") for Indian Community Development Block Grants (ICDBGs) published by HUD in the Federal Register on March 21, 2005 (R. 71-109). The ICDBG NOFA was part of a larger publication, commonly know as the "Super NOFA," which provided notice of the availability of funding from numerous HUD financial assistance programs. The Super NOFA (70 Fed. Reg. 13,576 – 14,381) provided application requirements for specific programs, such as the ICDBG program, at 70 Fed. Reg. 13,654 - 13,692 (R. 71-109), as well as provided general requirements and guidance applicable to all the programs at 70 Fed. Reg. 13,576 – 13,643 (R. 1-70). The regulations relating to the ICDBG program are located at 24 C.F.R. Part 1003 and were adopted pursuant to Section 106 of the Housing and Community Development Act of 1974. 42 U.S.C. 5306(a)(1) ("HCDA"). Section 105 of the Department of Housing and Urban Development Reform Act of 1989 ("HUD Reform Act"), as amended by the National Affordable Housing Act, amended Title I of HCDA by transferring the authority for making grants to Indian Tribes from the Section 107 discretionary fund of the HCDA to the allocation and distribution of funds provisions of Section 106 of the HCDA. Under Section 106 of the HCDA, as amended, one percent of the Title I appropriation, excluding the amounts appropriated for use under Section 107, is allocated for grants to Indian Tribes. 42 U.S.C. § 5306 (a)(1). The allocated amount is to be distributed to Indian Tribes/Villages on a competitive basis in accordance with selection criteria "contained in a regulation promulgated by the Secretary after notice and public comment." Id.

The Single Purpose Grant Application and Selection Process for ICDBG funds is outlined in Subpart D of 24 C.F.R. Part 1003. NVA's application was for $500,000 in ICDBG funds to be used for a new 4-plex rental housing construction project. (R. 513, Box 11 and 15). NVA's application was one of 39 ICDBG applications submitted by Alaskan Native Villages in the Fiscal Year ("FY") 2005 ICDBG NOFA competition for $6,807,990.00 allotted to HUD's Alaska Office of Native American Programs. (R. 1348).

Because the requested ICDBG funds would be used for a new 4-plex rental housing construction project, NVA was required to designate a Community Based Development Organization (CBDO) to carry out the activity, pursuant to 24 C.F.R. § 1003.302(b), which requires that "[n]ew housing construction can only be implemented through a nonprofit organization that is eligible under [24 C.F.R.] § 1003.204 or is otherwise eligible under [24 C.F.R.] § 1003.207(b)(3)." [1] 24 C.F.R. § 1003.207(b)(3) provides the following:

> ICDBG funds may not be used for the construction of new permanent residential structures or for any program to subsidize or assist such new construction, except:
>
> (i) As provided under the last resort housing provisions set forth in 24 C.F.R. part 42; or
>
> (ii) When carried out by a CBDO pursuant to § 1003.204(a). . . .

---

[1] The requirement for a CBDO for new housing construction is derived from Section 105(a)(15) of the HCDA, which provides that activities assisted under the HCDA may include the:

. . . assistance to neighborhood-based nonprofit organizations, local development corporations, nonprofit organizations serving the development needs of the communities in nonentitlement areas, or entities organized under section 301(d) of the Small Business Investment Act of 1958 to carry out a neighborhood revitalization or community economic development or energy conservation project in furtherance of the objectives of section 101(c) of this title. . . .

42 U.S.C. § 5305(a)(15). Section 101(c) of the HCDA describes nine specific objectives of the HDCA, among which is "the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons . . . ." 42 U.S.C. § 5301(c)(3).

The ICDBG NOFA implemented this "Threshold Requirement" for a CBDO in Section III.C.4.c,

which provides:

> *New Housing Construction Project Thresholds.* (1) In accordance
> with 24 C.F.R. 1003.302(b), new housing construction can only be
> implemented when necessary through Community Based
> Development Organization (CBDO). Eligible CBDOs are
> described in 24 C.F.R. 1003.204(c). You must provide
> documentation establishing that the entity implementing your new
> housing construction project qualifies as a CBDO.

70 Fed. Reg. 13658 (emphasis in original) (R.75).

In order to qualify as a CBDO, an entity must meet the criteria specified at 24 C.F.R. §

1003.204(c)(1), (2), or (3). An ICDBG applicant can designate an organization that meets eight

specific criteria outlined in 24 C.F.R. § 1003.204(c)(1).[2] If that organization fails to meet any of

those eight specific criteria, the regulations provide that an entity also qualifies as a CBDO if it

is a Small Business Administration (SBA) Section 301(d) entity;[3] or a SBA-approved Section

501 Development Company, a SBA-approved Section 502 Local Development Company or a

SBA Certified Section 503 Company.[4]  The regulations also permit entities to be CBDOs if they

---

[2] An organization can qualify as a CBDO if it has the following characteristics:

(i) Is an association or corporation organized under State or local law to engage in community development activities (which may include housing and economic development activities) primarily within an identified geographic area of operation within the jurisdiction of the grantee; and

(ii) Has as its primary purpose the improvement of the physical, economic or social environment of its geographic area of operation by addressing one or more critical problems of the area, with particular attention to the needs of persons of low and moderate income; and

(iii) May be either non-profit or for-profit, provided any monetary profits to its shareholders or members must be only incidental to its operations; and

(iv) Maintains at least 51 percent of its governing body's membership for low- and moderate-income residents of its geographic area of operation, owners or senior officers of private establishments and other institutions located in and serving its geographic area of operation, or representatives of low- and moderate-income neighborhood organizations located in its geographic area of operation; and

(v) Is not an agency or instrumentality of the grantee and does not permit more than one-third of the membership of its governing body to be appointed by, or to consist of, elected or other public officials or employees or officials of an ineligible entity (even though such persons may be otherwise qualified under paragraph (c)(1)(iv) of this section);and

(vi) Except as otherwise authorized in paragraph (c)(1)(v) of this section, requires the members of its governing body to be nominated and approved by the general membership of the organization, or by its permanent governing body; and

(vii) Is not subject to requirements under which its assets revert to the grantee upon dissolution; and

(viii) Is free to contract for goods and services from vendors of its own choosing.

[3] 24 C.F.R. § 1003.204(c)(2)(i).

[4] 24 C.F.R. § 1003.204(c)(2)(ii).  The references to Sections 301(d), 501, 502 and 503 are references to the Small Business Investment Act of 1958, 15 U.S.C. § 101 et seq.

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB                    6

have been designated by a HOME[5] participating jurisdiction as a Community Housing

Development Organization (CHDO).[6] An entity can also be a CBDO, under 24 C.F.R. §

1003.204(c)(2)(iv), if:

> It is a tribal-based nonprofit organization. Such organizations are
> associations or corporations duly organized to promote and
> undertake community development activities on a not-for-profit
> basis within an identified service area.

However, if the organization the grantee wishes to designate as a CBDO fails to meet any of

these criteria options in 24 C.F.R. § 1003.204(c)(1) or (2), under 24 C.F.R. § 1003.204(c)(3) of

the regulations, the entity may also be determined to qualify as CBDO if the grantee:

> . . . demonstrates to the satisfaction of HUD, through the provision
> of information regarding the organization's charter and by-laws,
> that the organization is sufficiently similar in purpose, function,
> and scope to those entities qualifying under [24 C.F.R. §
> 1003.204(c)(1) or (2)].

24 C.F.R. § 1003.204(c)(3) (emphasis added).

Section V.A.3. of the General Section of the Super NOFA advised potential applicants of

the importance of threshold compliance for applications and stated:

> Only applications that meet all of the threshold requirements will
> be eligible to receive an award of funds from HUD.

70 Fed. Reg. 13,589 (R. 15). Paragraph 6a to Appendix B of the ICDBG NOFA provided

further ICDBG application requirements to a potential applicant on addressing the threshold

---

[5] HOME Investment Partnership Act, 42 U.S.C. § 12701, et seq., provides for grants to states, cities,
urban counties and other units of local government to implement local housing strategies designed to
increase home ownership and affordable housing opportunities for low- and very low-income Americans.
The HOME Program regulations are at 24 C.F.R. part 92.

[6] 24 C.F.R. § 1003.204(c)(2)(iii).

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB                    7

requirements. It stated the following:

> Be specific to address all aspects of each relevant criterion and
> thresholds. It is important that these items be addressed as
> completely as possible since you may not submit additional
> information to address them once the application is submitted. If
> there are any questions regarding what project specific thresholds
> apply or under what rating factors your project will be rated, please
> contact the Area ONAP that serves your community for
> clarification prior to submission of the application.

70 Fed. Reg. 13,684 (emphasis in original) (R. 101).

Although NVA provided a tribal resolution designating and authorizing Aleutian

Housing Authority ("AHA") as its representative for the submission of the ICDBG application,

no tribal resolution was provided formally designating AHA as NVA's CBDO. Instead, AHA,

on behalf of NVA, provided one sentence in the application's "Community Development

Statement," stating:

> In accordance with 24 C.F.R. § 1003.302(b) new housing
> construction will be implemented by AHA as the Community
> Based Development Organization.

(R. 545). NVA then provided a one-page narrative; a copy of Title 18, Chapter 55, Article 4 of

the Alaska Statutes (AS 18.55.995-998),[7] and AHA's bylaws as support for AHA's

qualifications as a CBDO (R. 555-567). The narrative noted that AHA was a Regional Native

Housing Authority, pursuant to AS 18.55.996, as well as a Tribally Designated Housing Entity

under the Native American Housing Assistance and Self-Determination Act of 1996

(NAHASDA), for 12 federally recognized tribes in the Aleutian/Pribilof Island Region of Alaska

---

[7] Title 18, Chapter 55, Article 4 of the Alaska Statutes, 18.55.995-998, authorized the creation of
Regional Native Housing Authorities. AS 18.55.996(b) created, with respect to each of the 16 certain
named Alaska Native associations, "a public body corporate and politic to function in the operating area
of the individual associations...."

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB                8

(R. 556). It noted the number of Commissioners on AHA's Board and how they are selected. Id. The narrative also noted AHA's experience in providing affordable housing to low-to-moderate income Alaska Native families and, in what appears to be the only attempt to specifically address two of the eight criteria of 24 C.F.R. § 1003.204(c)(1), the narrative affirmatively stated that "AHA is free to contract for goods and services from vendors of its own choosing" and that its "assets are separate and independent from those of its member tribes." Id.[8] In summation, the narrative stated:

> The aforementioned description describes AHA as a CBDO as
> defined in §1003.204 of the regulations governing the ICDBG.
> * * *
> The provisions of the State of Alaska Statute and AHA By-Laws
> provide further evidence of CBDO activity.

(R. 556). Although it referenced 24 C.F.R. § 1003.204, NVA's narrative did not indicate under which provisions (i.e., 24 C.F.R. § 1003.204(c)(1), (2) or (3)) it claimed AHA's CBDO eligibility; nor did it make any arguments or assertions directed at any of these provisions to demonstrate AHA's eligibility.

In accordance with the procedures set forth in the NOFA, on November 2, 2005, HUD sent NVA a letter returning the application and referencing the Section III.C.7 Application Screening provisions of the ICDBG NOFA requiring that applications contain all the

---

[8] See 24 C.F.R. § 1003.204(c)(1)(vii) and (viii). NVA's application did not really grasp the essence of 24 C.F.R. § 1003.204(c)(1)(viii), which requires that the "would-be" CBDO's assets not be subject to requirements, like contractual requirements, under which its assets revert back to the ICDBG grantee upon its dissolution.

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB                    9

components specified therein (R. 812).[9]  The letter concluded that NVA did not meet the
application screening requirements and was therefore not adequately completed and could not be
rated.  In making this conclusion, the letter also referenced Section III.C.4.c of the ICDBG
NOFA specifying that new housing construction can only be implemented through a CBDO that
is eligible under 24 C.F.R. § 1003.204(c).  Included with the letter was a copy of a portion of
HUD's ICDBG Evaluation Forms, entitled "FY 2005 ICDBG Initial Application Screening and
Threshold Review (Mandatory) – Housing Construction" that relates to project specific
thresholds for new housing construction (R. 813-817).  Under "Initial Application Screening"
and "Applicant Eligibility," the form noted the application was not acceptable and the evaluator
commented "Ineligible CBDO, see Project Specific Threshold Requirements review."  (R. 813)[10]

In the following pages, entitled "Project Specific Threshold—Housing Construction," the
evaluator provided more detailed comments relating to why he determined that NVA's project
was ineligible (R. 816-817).  The evaluator noted the one-sentence statement made by NVA
designating AHA as its CBDO, as well as NVA's provision of AHA's authorizing Alaska statute
and Bylaws as documentation establishing further evidence of AHA's eligibility.  After noting
that NVA failed to specifically state under which provision of 24 C.F.R. § 1003.204[11] AHA
qualified as a CBDO, the evaluator analyzed AHA's Bylaws to see if they complied with the

---

[9] Section III.C.7 Application Screening provisions of the ICDBG NOFA provide that an application
would be rejected and returned unrated after an initial screening if, among other things, "[t]he proposed
project is [in]eligible." 70 Fed. Reg. 13,660 (R. 77).

[10] Although the initial screening noted rejection based on "Applicant eligibility," the rejection, in reality,
is based on "Project eligibility." HUD concedes that NVA is a recognized Indian Tribe and is an eligible
applicant under 24 C.F.R. § 1003.5(a). The project, however, was ineligible because new housing is only
eligible if carried out by an organization qualifying as a CBDO. As described further, the evaluator
determined that insufficient information was provided to determine whether AHA qualified as a CBDO.

[11] The evaluator erroneously cited this provision as "24 C.F.R. 1003.24."

criteria of 24 C.F.R. § 1003.204(c)(1).  Referring to 24 C.F.R. § 1003.204(c)(1)(iv)[12], the

evaluator notes that, "[a]lthough AHA Bylaws go on to state that 'four commissioners shall be

from and reside in one of the villages in the region', [AHA's Bylaws do] not maintain that at

least 51% of the governing body must be from low to moderate-income persons." (R. 817).

Citing 24 C.F.R. § 1003.204(c)(1)(v),[13] the evaluator notes that he could find nothing in AHA's

Bylaws that indicates that AHA does not permit more than one-third of the membership of its

Board of Commissioners to be elected or other public officials.  Id.  Finally, the evaluator noted

that NVA provided no information asserting that AHA was any of the entities that could qualify

as a CBDO under 24 C.F.R. § 1003.204(c)(2).[14]  Id.  Based on his review of the documentation

submitted by NVA in support of its selection of AHA as its CBDO, the evaluator concluded he

"could not find sufficient evidence that [AHA] was similar in purpose, function, and scope to

those entities qualifying under paragraphs (c)(1) or (2) of [24 C.F.R. § 1003.204(c)].  Id.

On November 8, 2005, AHA, on behalf of NVA, requested reconsideration of HUD's

decision to return NVA's application without rating it (R. 818-821).  The AHA letter was

followed by a November 18, 2005, letter from NVA and AHA's attorney (R. 822-823).

Together, the letters, among other things, alleged that HUD's decision violated the regulations

and its due process rights, and requested a hearing or opportunity to submit additional

information (R. 818-823).

---

[12] The evaluator erroneously cited this provision as "24 C.F.R. 1003.24(3)(c)(1)(iv)."

[13] The evaluator erroneously cited this provision as "24 C.F.R. 1003.24(3)(c)(v)."

[14] The evaluator erroneously cited this provision as "24 C.F.R. 1003.24(3)(c)(2)(i)."  The intention was to reference to all the qualifying entities in 24 C.F.R. § 1003.204(c)(2), including those referenced in (c)(2)(i), (ii), (iii) and (iv).

On November 23, 2005, defendant Wayne Mundy sent a letter to NVA's attorney addressing the allegations made in the November 8 and 18, 2005, letters and concluding that "[a]fter reviewing the evaluation process for NVA's ICDBG application . . . the Alaska HUD office has followed the requirements set forth in the NOFA and regulations regarding the NVA application and NVA does not have any additional administrative remedies." (R. 825). Accordingly, the request for reconsideration was effectively denied.

On December 5, 2005, the plaintiffs filed this action alleging that HUD erred in rejecting AHA as NVA's CBDO, denying NVA's application without prior notice and hearing, and without providing an opportunity to correct the application. On December 14, 2005, the parties stipulated to resolve the plaintiffs' motion for temporary restraining order and preliminary injunction by setting aside of $500,000 in excess funds from the Fiscal Year 2004 ICDBG funding cycle until September 30, 2006 to satisfy NVA's application should it prevail on the merits of this action and the application be remanded to HUD for further proceedings.

On or about February 23, 2006, plaintiffs filed a Motion for Summary Judgment seeking a declaration that HUD's decision is unsupported by substantial evidence, contrary to law and unconstitutional, and that AHA qualifies as a CBDO as a matter of law under 24 C.F.R. 1003.204(c), together with a remand to HUD requiring it to process NVA's application. HUD opposes plaintiffs' motion and, as explained below, plaintiffs' action should be dismissed.

## STANDARD OF REVIEW

Agency action may be set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). This standard of review is deferential and limited; the court's role is essentially to determine only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). See also Citizens Interested in Bull Run, Inc. v. Edrington, 781 F. Supp. 1502, 1506-07 (D. Or. 1991) (discussing arbitrary and capricious standard of review).

The Court's role is not to form an opinion as to what it would have done had it been presented with the question decided by the agency. The Court "is not empowered to substitute its judgment for that of the agency." Overton Park, 401 U.S. at 416. See also Environmental Defense Fund ("EDF") v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981). Although the Court must undertake a "thorough, probing, in-depth review," it is empowered only to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 415-416. See also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989); Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105 (1983); Carlton v. Babbitt, 900 F. Supp. 526, 530 (D.D.C. 1995). The Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree." EDF, 657 F.2d at 283 (citations omitted).

Parties challenging administrative decisions bear a heavy burden of proof; the agency's decision and processes are entitled to a presumption of validity and regularity. See Overton

Park, 401 U.S. at 415 ("Certainly, the Secretary' s decision is entitled to a presumption of regularity."); Independent Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000) (noting that APA standard of review is "highly deferential" and "presum[es] agency action to be valid"); Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976) (same); National Wildlife Fed'n v. Burford, 677 F Supp. 1445, 1453 (D. Mont. 1985) (noting "heavy burden of proof to show that the [agency] did not properly discharge its obligations. . ."), aff'd, 871 F.2d 849 (9th Cir. 1989). Thus, although the Court should not simply "rubber stamp[]" the agency's decision, the burden of proof is on the party challenging the decision. EDF, 657 F.2d at 283 n.28; Cleary, Gottlieb, Steen & Hamilton v. Department of Health and Human Services, 844 F. Supp. 770, 783 (D. D.C. 1993) (citing Schweiker v. McClure, 456 U.S. 188 (1982)).

Deference to a federal agency's decision "is especially appropriate where . . . the challenged decision implicates substantial agency expertise." Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993) (citing United States v. Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989)). Moreover, "[s]ubstantial deference is given 'to an agency's interpretation of its own regulations.'" Alaska Trojan Partnership v. Gutierrez, 425 F.3d 620, 627-628 (9th Cir. 2005), quoting, Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The "court 'must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " Id., quoting, Thomas Jefferson Univ. v. Shalala, see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation."); Wards Cove Packing Company v. NMFS, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of

regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation.").

ARGUMENT

I.   HUD DID NOT ERR IN REJECTING AHA AS NVA'S CBDO.

A.   HUD Was Correct In Concluding That AHA Is Not An Eligible CBDO,
Under 24 C.F.R. § 1003.204(c)(2)(iv) And (c)(3), As A Matter Of Law.

Plaintiffs allege that, as a matter of law, AHA meets the eligibility criteria of, or is

sufficiently similar to, several types of organizations described in 24 C.F.R. § 1003.204(c), and

that NVA "sufficiently alleged such eligibility in its application." (Motion for Summary

Judgment, hereinafter "M." at 9). While AHA might be an eligible CBDO, it is not a CBDO as a

matter of law.  NVA acknowledges this when it admitted that, "AHA's bylaws in existence at the

time of filing the application did not include all [8] criteria of [24 C.F.R. § 1003.204(c)(1)] due

to one or two minor omissions in the bylaws' language on board member eligibility."  (M. at 14).

Based on the information provided in NVA's ICDBG application, HUD was correct in

concluding AHA was not eligible as a CBDO.  The ICDBG NOFA made it clear that applicants

were to "[b]e specific to address all aspects of each relevant criterion and thresholds."  (R. 101).

Applicants were advised that, consistent with the competitive nature of this grant process, "[i]t is

important that these items be addressed as completely as possible since [they could] not submit

additional information to address them once the application [was] submitted." Id. (emphasis

added).  Yet these admittedly flawed bylaws were essentially all the documentation NVA

provided to demonstrate AHA's eligibility.  Moreover, NVA and AHA admit that they were

advised in NOFA training provided by HUD that an Alaska Native Regional Housing Authority

"is not automatically eligible as a CBDO." (M. at Ex. C, p.4).  While AHA may meet the

eligibility criteria of, or is sufficiently similar to, the types of organizations described in 24

C.F.R. § 1003.204(c), plaintiffs' claim that NVA "sufficiently alleged such eligibility in its application" misses the mark. Putting aside the question of eligibility, the NOFA requires the ICDBG applicant to address the threshold issue as "completely as possible" (R. 101) and the regulations require the applicant to "demonstrate[] to the satisfaction of HUD, through the provision of information regarding the organization's charter and by-laws, that the organization is sufficiently similar" to those organizations that would clearly qualify under 24 C.F.R. § 1003.204(c)(1) or (2). 24 C.F.R. § 1003.204(c)(3). NVA did neither. "Alleging" eligibility was simply not enough and HUD was justified in determining the application was incomplete after initial screening.

    1.    AHA Is Not An Eligible CBDO Under 24 C.F.R. § 1003.204(c)(2)(iv).

Acknowledging that AHA would not strictly qualify under the eight criteria of 24 C.F.R. § 1003.204(c)(1) because of flawed bylaws, plaintiffs point out that 24 C.F.R. § 1003.204(c)(2)(iv) provides that an entity failing to meet that criteria could still qualify if:

> It is a tribal-based nonprofit organization. Such organizations are associations or corporations duly organized to promote and undertake community development activities on a not-for-profit basis within an identified service area.

24 C.F.R. § 1003.204(c)(2)(iv) (emphasis added). Plaintiffs allege that an examination of AHA's charter, AS 18.55.996, and bylaws (R. 560) shows that AHA is "tribally-based." (M at 9-10). However, an examination of AHA's charter and bylaws indicates differently. As the administrative record reflects, AHA is a Regional Native Housing Authority created by the Aleut League, pursuant to Section 18.55.996 of the Alaska Statutes (R. 557-559). More specifically, this state legislation created, with respect to each of the 16 certain named Alaska Native

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB        17

associations (including Aleut League), "a public body corporate and politic to function in the operating area of the individual associations to be known as the regional housing authority of the associations...." AS 18.55.996(b) (R. 558). The CBDO narrative in NVA's ICDBG application described this region to include "12 federally recognized tribes in the Aleutian/Pribilof Islands Region in Alaska" and to be "comprised of approximately 100,000 square miles." (R. 556). AHA's bylaws show that Commissioners for AHA are chosen by the Aleutian/Pribilof Island Association, Inc.,[15] from residents residing "in one of the villages in the region, as follows: Sand Point, False Pass, Nelson Lagoon, Saint George, King Cove, Unalaska, Atka, Akutan, Belofski, Nikolski or Saint Paul." (R. 560).

While there is no definition of "tribal-based" in the ICDBG regulations, Section 102(a)(17) of the Housing and Community Development Act of 1974 ("HCDA") defines the term "Indian tribe" as:

> [A]ny Indian tribe, band, group, and nation, including Alaska Indians, Aleuts, and Eskimos, and any Alaskan Native Village, of the United States, which is considered an eligible recipient under the Indian Self-Determination and Education Assistance Act (Public Law 93-638) or was considered an eligible recipient under chapter 67 of title 31, United States Code, prior to the repeal of such chapter.

42 U.S.C. 5302(a)(17). The Indian Self-Determination and Education Assistance Act ("Self-Determination Act"), at 25 U.S.C. § 450b(e), defines "Indian tribe" as:

> [A]ny Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

---

[15] The Aleutian/Pribilof Island Association, Inc., is the apparent successor to the Aleut League.

Under the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. § 479a, the

Secretary of the Interior is required to publish in the Federal Register a list of "all Indian tribes

which the Secretary recognizes to be eligible for the special programs and services provided by

the United States to Indians because of their status as Indians." 25 U.S.C. § 479a-1(a). That list,

last published in the Federal Register on November 5, 2005, at 70 Fed. Reg. 71194-71198, listed

561 "tribal entities recognized and eligible for funding and services from the Bureau of Indian

Affairs by virtue of their status as Indian tribes." 70 Fed. Reg. at 71194. Included, in the list,

are NVA, as well as Sand Point, False Pass, Nelson Lagoon, Saint George, King Cove,

Unalaska, Atka, Belofski, Nikolski and Saint Paul, as entities eligible for the special programs

and services provided by the United States. 70 Fed. Reg. at 71197-71198. However, neither the

Aleutian/Pribilof Island Association, Inc., nor the Aleut League, are listed as "tribal entities."

Moreover, the 9th Circuit, in Cook Inlet Native Association v. Bowen, 810 F.2d. 1471 (9th Cir.

1987), held that the Alaska Native regional corporations recognized as eligible for the special

programs and services under the Self-Determination Act are the regional "for-profit"

corporations established under the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §

1601 et seq. ("Claims Settlement Act"), not the nonprofits like Aleutian/Pribilof Island

Association, Inc. Therefore, Aleutian/Pribilof Island Association, Inc., is not an eligible

recipient under the Self-Determination Act and not an "Indian tribe," pursuant to the Self-

Determination Act, under the HCDA.

A second opportunity to be determined an Indian tribe under the HCDA's definition

exists if the would-be tribe was considered an eligible recipient under the State and Local Fiscal

Assistance Act of 1972, 67 U.S.C. § 6701 et seq., prior to its repeal. According to the ICDBG regulations, eligible recipients under the State and Local Fiscal Assistance Act of 1972 are to be determined by the Department of Treasury, Office of Revenue Sharing. 24 C.F.R. § 1003.5(a). As noted by the HCDA, the Consolidated Omnibus Budget Reconciliation Act of 1985 repealed the State and Local Fiscal Assistance Act of 1972. Pub. L 99-272. According to the Department of Treasury website, the Office of Revenue Sharing was terminated on September 30, 1987. *http://www.ustreas.gov/education/history/events/09-sep.shtml*. Moreover, NVA provided no documentation or information evidencing that Aleutian/Pribilof Island Association, Inc., or the Aleut League were an "Indian tribe" under the HDCA because they were recipients under the State and Local Fiscal Assistance Act of 1972.

Accordingly, neither the Aleutian/Pribilof Island Association, Inc., nor the Aleut League are an "Indian tribe" within the definition of the HCDA through either the Self-Determination Act or the State and Local Fiscal Assistance Act of 1972. For that reason, the housing authority established by the Aleutian/Pribilof Island Association, Inc., or the Aleut League cannot be a "tribal-based" organization. Instead, it is an organization based on state law and created by an association within a "Region comprised of approximately 100,000 square miles" and "12

Federally recognized tribes." (R. 556). Consequently, AHA does not qualify as a CBDO under 24 C.F.R. § 1003.204(c)(2)(iv) either.[16]

Plaintiffs allege that AHA is tribally based because it is a Tribally Designated Housing Entity ("TDHE") for NVA. However, the fact that AHA is a TDHE for NVA under the Native American Housing Assistance and Self Determination Act of 1996 ("NAHASDA") is irrelevant to the CBDO eligibility issue. First, the Indian Housing Block Grant program under NAHASDA is a separate program from the ICDBG program under HCDA with different requirements and different definitions. Second, NAHASDA specifically provides that "regional housing authorities in the State of Alaska" are TDHEs. 25 U.S.C. § 4103(21)(B)(ii). HCDA and its implementing regulations do not have a similar provision specifically deeming "regional housing authorities in the State of Alaska" as CBDOs. 42 U.S.C. 5301 et seq. and 24 C.F.R. Part 1003. Moreover, there is no requirement under the provision of NAHASDA, upon which plaintiffs' rely, that a TDHE be "tribally-based." Indeed, any "entity established . . . by operation of state

---

[16] With respect to the question of whether AHA was organized, as prescribed by 24 C.F.R. § 1003.204(c)(2)(iv), to promote activities within an "identified service area," the ICDBG regulations define the term "Identified Service Area" as the following:

> (1) A geographic location within the jurisdiction of a tribe (but not the entire jurisdiction) designated in comprehensive plans, ordinances, or other tribal documents as a service area;

> (2) The Bureau of Indian Affairs (BIA) service area, including residents of areas outside the geographic jurisdiction of the tribe; or

> (3) The entire area under the jurisdiction of a tribe which has a population of members of under 10,000.

24 C.F.R. §1003.4 (emphasis added). Again, since Aleutian/Pribilof Island Association, Inc., is not a tribe, it has no "identified service area" within which AHA was organized to promote activities under HCDA or its implementing regulations. As noted in plaintiffs' Motion, state law (AS 18.55.996(b)) establishes the geographic area in which AHA functions as a Regional Housing Authority.

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB          21

law providing specifically for housing authorities or housing entities for Indians..." could be a

TDHE, whether or not it is "tribally-based."  25 U.S.C. § 4103(21)(B)(ii).

Finally, plaintiffs refer to HUD's training power points presentation slides for ICDBG

applicant training that state that tribes may designate regional housing authorities as their CBDO

as proof of AHA's CBDO eligibility as a matter of law.[17]  (M. at 9-12).  However, these power

points presentation slides, while advising that an applicant may assert that a regional housing

authority is an eligible CBDO, clearly do not shift the obligation for showing CBDO eligibility

away from the applicant.  Instead, the power points presentation slides advise applicants that

regional housing authorities are not automatically deemed CBDOs and specifically state the

following:

> Remember: a [Regional Housing Authority or Tribally Designated
> Housing Entity] is not automatically eligible as a CBDO and [an
> applicant] must submit documentation under one of the [categories
> in 24 C.F.R. § 1003.204(c)]....

(M. at Ex.C. p 4, emphasis added).[18]  Plaintiffs are mistaken to rely on these power point

presentations as support for AHA's CBDO eligibility as a matter of law.  The materials do not

support their argument, indeed, they show that plaintiffs were made fully aware that HUD

absolutely did not consider regional housing authorities eligible CBDOs as a matter of law.

---

[17] The guidelines attached to Plaintiff's Motion as Exhibit C are actually from training during the 2004 funding cycle.  The training materials for the 2005 funding cycle are at pages 334-506 of the Administrative Record.

[18] See also the power point slide No. 31, page 11, from the 2005 ICDBG NOFA Training Manual, where HUD advises, again, that an Housing Authority is not automatically considered a CBDO (R. 347).

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB            22

2.      NVA Failed To Comply With 24 C.F.R. § 1003.204(c)(3) By Not
        Adequately Demonstrating The Similarity

Plaintiffs contend that AHA is not only sufficiently similar, it is substantially similar to

in purpose, function and scope to an entity qualifying under 24 C.F.R. § 1003.204(c)(1) and (2).

However, 24 C.F.R. § 1003.204(c)(3) places an obligation upon an ICDBG applicant to

"demonstrate[] to the satisfaction of HUD, through the provision of information regarding the

organization's charter and by-laws," how an entity is sufficiently similar in purpose, function and

scope to those described in 24 C.F.R. § 1003.204(c)(1) and (2).  24 C.F.R. § 1003.204(c)(3)

(emphasis added).  Merely providing admittedly flawed bylaws and an Alaska Statute without

any discussion of similarity does not meet that obligation.  In its motion, "NVA does not dispute

that AHA's bylaws in existence at the time of filing the application did not include all criteria of

[24 C.F.R. § 1003.204(c)(1)]...."  (M. at 14).  Yet those bylaws; a copy of Title 18, Chapter 55,

Article 4 of the Alaska Statutes; and a one-page narrative is all NVA provided to demonstrate

AHA's similarity to eligible CBDOs.  (R. 555-567).  The narrative noted a number of facts about

AHA, but, although it referenced 24 C.F.R. § 1003.204, NVA's narrative did not indicate under

which provisions of that regulation (i.e., 24 C.F.R. § 1003.204(c)(1), (2) or (3)) it claimed

AHA's CBDO eligibility; nor did it make any arguments or assertions directed at any of these

provisions to "demonstrate" AHA's eligibility.  The closest attempt to specifically address any

of the eight criteria of 24 C.F.R. § 1003.204(c)(1) were the narrative's statements that "AHA is

free to contract for goods and services from vendors of its own choosing" (i.e., possibly

addressing 24 C.F.R. § 1003.204(c)(1)(viii)) and that its "assets are separate and independent

from those of its member tribes" (i.e., somewhat addressing 24 C.F.R. § 1003.204(c)(1)(vii)).

These statements clearly did not demonstrate a similarity even though the narrative concluded that "[t]he aforementioned description describes AHA as a CBDO." (R.556). In case it did not, NVA directed HUD to its bylaws and the Alaska State Statutes without providing any "information" regarding them to demonstrate how they applied to the CBDO criteria.

By just providing AHA's organic documents, NVA fell short of its obligations under 24 C.F.R. § 1003.204(c)(3). NVA assumed HUD would cull through the by-laws and charter, determine their relevance to any applicable criteria, analyze the documentation in accordance therewith and find satisfaction that AHA, if not eligible as a CBDO, was sufficiently similar to a CBDO. While HUD did review the documentation, as the record of the evaluation reflects (R. 813-817), it was NVA's obligation, not HUD's, under the requirements of the ICDBG NOFA to "address all aspects" of the threshold eligibility issue (R. 101) and to "demonstrate[] to the satisfaction of HUD" how AHA is sufficiently similar to those entities described in 24 C.F.R. § 1003.204(c)(1) and (2). 24 C.F.R. § 1003.204(c)(3). This obligation is particularly crucial now that NVA admittedly "makes no claim that AHA meets the precise criteria of [24 C.F.R. § 1003.204(c)(1)]. . . ." (M. at 14).

As asserted by plaintiffs, HUD has recognized the Bristol Bay Housing Authority (BBHA) as a CBDO because Levelock Village Council ("LVC") demonstrated to the satisfaction of HUD, through the provision of information regarding BBHA's charter and by-laws, how it was sufficiently similar to those described in 24 C.F.R. § 1003.204(c)(1) and (2). (R. 1021-1024, 1089). LVC successfully submitted an ICDBG application for new construction designating, through tribal resolution, BBHA as its CBDO and stating it sought qualification of BBHA under 24 C.F.R. § 1003.204(c)(3), because "it was sufficiently similar in purpose,

function and scope to qualifying groups qualifying as CBDOs under 24 C.F.R. §

1003.204(c)(2)(iv)." (R. 975). Instead of merely providing a narrative describing BBHA's

region of service and accomplishments and providing a copy of BBHA's bylaws, LVC described

how BBHA "serves Native Alaskans that have a common heritage and sharing (sic) common

interests" and thus is similar to an Indian tribe (R. 975). LVC notes that Congress recognized

this "common heritage" and "common interest" in Section 7(a) of the Alaska Native Claim

Settlement Act of 1971, 43 U.S.C. § 1606(a)[19], and that it was recognized by "many

anthropologic and sociologic studies." (R. 975). As a fall-back, LVC also attempted to address

all eight criteria of 24 C.F.R. § 1003.204(c)(1). (R. 975-976). Unlike NVA, LVC not only cited

the applicable CBDO provisions of 24 C.F.R. § 1003.204(c) under which it sought BBHA's

eligibility, LVC tied its justification to those provisions to demonstrate BBHA's eligibility to

HUD's satisfaction.

     HUD's decision in accepting BBHA and an eligible CBDO and not accepting AHA was

not arbitrary and capricious. In accordance with 24 C.F.R. § 1003.204(c)(3), LVC's resolution

demonstrated to the satisfaction of HUD that BBHA was sufficiently similar in purpose, function

and scope to those described in 24 C.F.R. § 1003.204(c)(1) and (2). In contrast, NVA's

submission did not. 24 C.F.R. § 1003.204(c)(3) gives HUD broad discretion. Natural Res. Def.

Council, Inc. v. EPA, 22 F.3d 1125, 1148-49 (D.C.Cir.1994) (statute requiring demonstration of

equal effectiveness of alternative testing program "to the satisfaction of the Administrator"

---

[19] When originally adopted in 1971, AS 18.55.996, listed 12 Alaska Native associations and the Alaska Federation of Natives, Inc. These 12 Alaska Native associations were the same 12 Alaska Native associations that Congress referred to in Section 7(a) of the Claims Settlement Act when it authorized the Secretary of the Interior to divide the State of Alaska into 12 geographic regions "with each region composed as far as practicable of Natives having a common heritage and sharing common interests." 43 U.S.C. § 1606(a) (emphasis added).

grants EPA broad discretion to determine equivalency).  See also Federal Express Corp. v. Mineta, 373 F.3d 112, 116 (D.C. Cir. 2004), and Federal Express. Corp. v. Department of Transp., 434 F.3d 597, 601 (D.C.Cir. 2006).  NVA was obligated by the requirements of the ICDBG NOFA to "address all aspects" of the threshold eligibility issue (R. 101) and to "demonstrate[] to the satisfaction of HUD," how AHA is sufficiently similar to those entities described in 24 C.F.R. § 1003.204(c)(1) and (2).  This obligation was particularly crucial since plaintiffs acknowledge that AHA does not meet the criteria of 24 C.F.R. § 1003.204(c)(1).  As noted in the evaluator's comments, NVA did not even reference the provisions of 24 C.F.R. § 1003.204(c) under which it sought AHA's eligibility (R.816) and it only made the slightest attempt to tie any discussion in the narrative to any of the criteria in the regulation.[20]  Instead, the evaluator was left to guess on what basis NVA relied.  The criteria of 24 C.F.R. § 1003.204(c)(3) gives HUD broad discretion (i.e., satisfaction) and places significant burden on the applicant to actively make a comparison (i.e., demonstrate) of purpose, function and scope of its chosen organization to organizations meeting the criteria in 24 CRF 1003.204(c)(1) and (2).  Plaintiffs confuse an applicant's obligation to demonstrate by providing "information regarding the organization's charter and bylaws" with simply providing the charter and bylaws and passively waiting for HUD's analysis and without providing explanation to HUD.  HUD did not abuse its discretion.  NVA failed to comply with the NOFA and regulations.

---

[20] Although not citing the provisions of 24 C.F.R. § 1003.204(c)(1), it appears NVA may have attempted to specifically address two of the eight criteria by stating that "AHA is free to contract for goods and services from vendors of its own choosing" (i.e., 204 (c)(1)(viii)) and that its "assets are separate and independent from those of its member tribes" (i.e., 204 (c)(1)(vii)).  (R. 556)

3.   HUD's Interpretation of 24 C.F.R. § 1003.204(c)(2)(iv) And (3) Is Entitled to Deference

"Substantial deference is given 'to an agency's interpretation of its own regulations.'" Alaska Trojan Partnership v. Gutierrez, 425 F.3d 620, 627-628 (9th Cir. 2005), quoting, Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The "court 'must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " Id., quoting, Thomas Jefferson Univ. v. Shalala, see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation."); Wards Cove Packing Company v. NMFS, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation.").

HUD's interpretation of the plain language of 24 C.F.R. § 1003.204(c)(2)(iv) and (3) is correct. As noted above, AHA is not a "tribal-based nonprofit organization" because the source of its creation and its base—Aleutian/Pribilof Island Association, Inc., and the State legislature—are not an Indian tribe. Accordingly, it is not a CBDO under 24 C.F.R. § 1003.204(c)(2)(iv). It may qualify as "sufficiently similar" to a CBDO, under 24 C.F.R. § 1003.204(c)(3), but the plain language of that regulation states that an ICDBG applicant must "demonstrate" to HUD's satisfaction that it is sufficiently similar. NVA did not do so. HUD's interpretation of these regulations is not plainly erroneous or inconsistent with the regulations' plain language, nor does that plain language compel an alternative reading. "'The court need not

conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding,' but only that the agency's interpretation is reasonable and is not contrary to congressional intent." Seldovia Native Ass'n v. Lujan, 904 F.2d 1335, 1342 (9th Cir.1990), quoting Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843 n. 11, (citations omitted).

In addition, the canon of construction that statutes (or, as plaintiffs claim, regulations) benefitting Native Americans should be construed liberally in their favor is not applicable here. First of all, the canon does not apply when the agency charged with administering the statute or regulation is owed deference. Chugach Alaska Corp. v. Lujan, 915 F.2d 454, 457 n.4 (9th Cir.1990); citing Seldovia Native Ass'n v. Lujan, 904 F.2d at 1342, and Haynes v. United States, 891 F.2d 235, 239 (9th Cir.1989). "Moreover, the question here is not whether to favor Native Americans, but which Native Americans to favor." Id. Only a limited amount of ICDBG funds will be granted to only "Indian tribes and tribal organizations on behalf of Indian tribes." ICDBG NOFA Sec. G.2 and 3, 70 Fed. Reg. 13655 (R. 72). Accordingly, any ICDBG funds given to NVA simply diminish ICDBG funds available for other Indian tribes. Thus, the issue is not whether Native Americans will receive ICDBG funding, but which Native Americans will receive it. Chugach Alaska Corp. v. Lujan, 915 F.2d at 457 n.4. Plaintiffs' claim that HUD's regulation should be construed liberally in their favor because NVA is a Native village is simply without merit. To the extent that HCDA and the ICDBG program place a trust responsibility upon HUD, HUD owes that trust responsibility to every Indian tribe in Alaska, not just NVA.

Accordingly, if there is any ambiguity in the regulations at issue that would result in an interpretation different than HUD's, the court should defer to HUD's interpretation.

B.   HUD Did Not Err In Determining That NVA Failed To Submit Sufficient Evidence Of AHA's CBDO Eligibility

Plaintiffs claim "NVA should not be penalized because HUD either failed to carefully read the documents, interpret AS 18.55.996 and the regulations, or make the necessary connection between NVA's submittals and the regulations." (M. at 19-20). This claim demonstrates plaintiffs' utter failure to grasp NVA's responsibility under the NOFA and regulations or is a dubious attempt to transfer those responsibilities to HUD. Paragraph 6a to Appendix B of the ICDBG NOFA clearly places complete responsibility on the ICDBG applicant to address the threshold requirements by stating the following:

> Be specific to address all aspects of each relevant criterion and thresholds. It is important that these items be addressed as completely as possible since you may not submit additional information to address them once the application is submitted. If there are any questions regarding what project specific thresholds apply or under what rating factors your project will be rated, please contact the Area ONAP that serves your community for clarification prior to submission of the application.

70 Fed. Reg. 13,684 (emphasis in original and added) (R. 101). Plaintiffs' have already admitted that "NVA makes no claim that AHA meets the precise criteria of [24 C.F.R. § 1003.204(c)(1)]. . ." (M. at 14). So, as the evaluator noted, a review of the documentation submitted would have done little for AHA's eligibility under that criteria (R. 816-817). Moreover, as noted above, neither the Aleutian/Pribilof Island Association, Inc., nor the Aleut League are an "Indian tribe" within the definition of the HCDA through either the Self-Determination Act or the State and Local Fiscal Assistance Act of 1972. For that reason, AHA, the housing authority established by

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB          29

the Aleutian/Pribilof Island Association, Inc., or the Aleut League, under AS 18.55.996, cannot

be a "tribal-based" organization. Instead, it is an organization based on state law. Consequently,

AHA would not qualify as a CBDO under 24 C.F.R. § 1003.204(c)(2)(iv) either, so carefully

reading the documents and interpreting AS 18.55.996 would not have mattered for that criterion,

as well. AHA could qualify only under 24 C.F.R. § 1003.204(c)(3):

> ...if [NVA] demonstrates to the satisfaction of HUD, through the
> provision of information regarding the organization's charter and
> by-laws, that the organization is sufficiently similar in purpose,
> function, and scope to those entities qualifying under [24 C.F.R. §
> 1003(c)(1) or (2)].

24 C.F.R. § 1003.204(c)(3) (emphasis added). Accordingly, the obligation to demonstrate

AHA's similarity is not placed on HUD as plaintiffs would like, it is placed on NVA. NVA did

not meet that obligation. Not only did NVA's narrative not indicate under which provisions of

24 C.F.R. § 1003.204(c)(1) or (2) it was claiming that AHA was similar, NVA's narrative made

no arguments, assertions or even comments directed at any of these provisions to demonstrate

AHA's eligibility (R. 556). Instead, as plaintiffs indicated in their motion, NVA simply

provided organic documents and left it for HUD to figure it out. HUD did not abuse its

discretion by determining NVA failed to submit adequate evidence of AHA's eligibility. NVA

failed to comply with the NOFA and regulations.

Moreover, plaintiffs' argument (M. at 21-22) that HUD treated NVA as an "alien,

unknown entity" and that "given HUD's intimate familiarity . . . with AHA . . . HUD abused its

discretion in rejecting AHA as NVA's CBDO," is simply absurd. The ICDBG program is a

competitive grant program with limited funds available to the many Indian tribes and tribal

organizations that apply.[21]  HUD is "intimately familiar" with every applicant because it works closely with the Alaska Native villages, tribes, corporations and housing authorities under the ICDBG program and the IHBG program of NAHASDA.  To follow plaintiffs' logic, no application would stand on its own and no applicant would need to compete.  HUD would simply fill in all the gaps based on its independent knowledge and "intimate familiarity" with each applicant unless that applicant was truly an "alien, unknown entity."  According to plaintiffs' view, only then would the alien, unknown applicant have to compete and address all aspects of this and other threshold issues.  In all fairness to this competition for limited grant funds among many needy projects, each application must stand on its own without HUD supplementing its intimate knowledge of the applicant.  To do so would be giving some applicants an unfair competitive advantage over others.

C.     HUD Did Not Violate 24 C.F.R. § 4.26 (a)(1) And (b) (2) or Section V.B.9.a of The ICDBG NOFA By Not Coaching NVA To Correct Its Application.

Plaintiffs claim that HUD erred by not contacting NVA, not advising NVA that it had failed to meet the CBDO eligibility threshold requirements for AHA and not giving NVA the opportunity to correct its application (M. at 22-30).  Plaintiffs claim this error was the result of HUD misconstruing Section 103 of the Department of Housing and Urban Development Reform Act of 1989, 42 U.S.C. 3537a ("HUD Reform Act"), and violating regulations adopted to implement it.  However, advising NVA of what it needed to demonstrate AHA's qualifications as a CBDO would have overstepped the limitations on permissible contacts during the selection process and moved from seeking clarification to coaching an applicant in how to improve the

---

[21] For the FY 2005 ICDBG NOFA competition, HUD's Alaska Office of Native American Programs received 39 applications to compete for $6,807,990.00 in mostly $500,000 grant requests (R. 1348). HUD awarded 16 grants.  Id.

substantive quality of its application. Such contact would have been improper.

Section 103 of the HUD Reform Act significantly restricts HUD staff contacts with NOFA applicants during the selection process for a competitive grant.[22] It prohibits any HUD officer or employee from "knowingly disclos[ing] any covered selection information regarding such selection, directly or indirectly, to any person other than a person authorized by the Secretary to receive such information." 42 U.S.C. 3537a(a). "Covered selection information" means:

> (A) any information that is contained in any application or request for assistance, or any information regarding the decision of the Secretary to make available assistance or other information that is determined by the Secretary to be information that is not generally available to the public (not including program requirements and timing of the decision to make assistance available); and
>
> (B) any information that is required by statute, regulation, or order to be confidential.

42 U.S.C. § 3537a(e)(3). HUD has implemented regulations, pursuant to Section 103 of the HUD Reform Act, at 24 C.F.R. part 4, subpart B. The purpose of these regulations and the prohibition on disclosure of covered selection information "is to preclude giving an unfair advantage to applicants who would receive information not available to other applicants and the public." 24 C.F.R. § 4.20.

During the selection process, the regulations permit a HUD employee to only disclose information with respect to the requirements of a HUD program and to provide technical

---

[22] Selection process means the period with respect to a selection for assistance that begins when the HUD official responsible for awarding the assistance involved, or his or her designee, makes a written request (which includes the selection criteria to be used in providing the assistance) to the Office of General Counsel to prepare the NOFA, solicitation, or request for applications for assistance for publication in the Federal Register. The period includes the evaluation of applications, and concludes with the announcement of the selection of recipients of assistance. 24 C.F.R. § 4.22.

assistance concerning program requirements, "provided that the requirements or statements are disclosed on a uniform basis to any applicant or potential applicant." 24 C.F.R. § 4.26(a)(1). The regulations describe the term "technical assistance" as including such activities as explaining and responding to questions about program regulations, defining terms in an application package, and providing other forms of technical guidance that may be described in a NOFA. Id. HUD provided uniform technical assistance by conducting two training sessions in Alaska for potential ICDBG applicants on April 19 and 28, 2005, which provided general guidance and answered general questions (R. 508-512). The term "technical assistance" also includes identification of those parts of an application that need substantive improvement, but this term does not include advising the applicant on how to make those improvements. 24 C.F.R. § 4.26(a)(1). This provision, as plaintiffs assert, sounds like HUD staff can alert applicants to all the faults in their applications and allow changes as long as they do not tell the applicant how to change the application throughout the selection process. However, that is not the case. In fact, prior to HUD Reform Act regulations in 24 C.F.R. part 4 and part 12 being combined into 24 C.F.R. part 4 (61 Fed. Reg. 14448-14452, Apr. 1, 1996), the "identification of those parts of an application that need substantive improvement" applied only to technical assistance provided "[b]efore deadline of submission of applications." 57 Fed. Reg. 34246, 34249, Aug. 4, 1992, see prior rule 24 C.F.R. § 4.105(a)(1) (emphasis added). HUD still treats technical assistance in the same manner. Contacts during evaluation of applications, while permitted, are very limited.

Although the HUD Reform Act regulations permit a HUD employee to contact an applicant during the selection process for the purpose of communication of "the applicant's

failure to qualify, after a preliminary review for eligibility and completeness," or for "[c]larification of the terms of the applicant's application," including "a request for additional information consistent with regulatory requirements," it is important to remember that the regulations do not mandate that contact as the plaintiffs try to imply. 24 C.F.R. § 4.28(2)(2) (emphasis added). In fact, HUD has gone through much effort to caution and alert staff to the restrictions of the HUD Reform Act. The General Counsel of HUD have issued several Memoranda over the years in that effort. (R. 303, G. Laster; R. 306, R. Hauser; and R. 308, K. Gottfried).[23] HUD General Counsel have advised HUD employees that "covered selection information," which may not be disclosed, includes "information about program funding that has not been made public, selection processes, relative standing . . .or other information that might allow someone to make substantive improvements to his or her application package, or that might otherwise give an unfair advantage to any applicant." (R. 306, emphasis added). General Counsel have gone on to advise that "[t]he important thing to bear in mind here is that, while [HUD staff] can provide information to help applicants comply with the application process, [HUD staff] cannot advise or assist applicants with the substantive contents of their applications." (R. 308-309). Moreover, the training of HUD staff involved in competitive grants has also reinforced the restrictions of the HUD Reform Act and has advised HUD employees that they cannot "coach" applicants to make substantive improvements to their applications (R. 292). Therefore, though permitted on a limited basis, HUD employees must be

---

[23] Plaintiffs' Motion, Note 6, questions the usefulness of the General Counsel memoranda because they do not cite 24 C.F.R. § 4.26. Although the memorandum from General Counsel Laster does cite the regulations (R. 304), these memoranda were intended as practical guidance to HUD staff and not legal briefs. They are invaluable with respect to HUD's interpretation and application of the requirements of the HUD Reform Act and its implementing regulations. As discussed supra, "[s]ubstantial deference is given 'to an agency's interpretation of its own regulations.'" Alaska Trojan Partnership v. Gutierrez, 425 F.3d at 627-628, quoting, Thomas Jefferson Univ. v. Shalala, 512 U.S. at 512.

cautious in any such contact less it result in giving an unfair advantage to any applicant. To advise NVA of its failure to meet the CBDO threshold requirements and allow it to submit additional information would be coaching NVA in the substantive contents of their applications and giving NVA an unfair` competitive advantage.

Section V.B.9.a. of the ICDBG NOFA advises applicants that HUD "may contact [them] to clarify an item in [their] application or correct technical deficiencies." (R. 87).[24] However, the NOFA goes on to advise applicants that "HUD may not seek clarification of items or responses that would improve the substantive quality of [their] response to any rating factor." Id. Again, this contact is permissible but not mandated and, although this provision of the NOFA speaks to prohibiting clarifications that would improve the substantive quality of the response to any rating factor, the intent is clearly that the HUD employee cannot seek clarification that would improve the substantive quality of the application, whether the substantive quality relates to a rating factor or a threshold issue, like CBDO eligibility. To argue differently is unreasonable since this intent, at least with respect to threshold issues, is supported by the Paragraph 6a to Appendix B of the ICDBG NOFA where HUD addressed application threshold requirements, stating:

> Be specific to address all aspects of each relevant criterion and thresholds. It is important that these items be addressed as completely as possible since you may not submit additional information to address them once the application is submitted. If there are any questions regarding what project specific thresholds apply or under what rating factors your project will be rated, please

---

[24] Section V.B.9.a. provides specific examples of the type of "curable (correctable) technical deficiencies," for which HUD may contact an applicant for "proper completion" of an application. (R. 88). They include "the failure to submit the proper certifications or failure to submit an application signed by an authorized official." Id.

> contact the Area ONAP that serves your community for
> clarification prior to submission of the application.

70 Fed. Reg. 13,684 (emphasis in original) (R. 101).

First, this ICDBG application requirement advises applicants that HUD will not take

advantage of the permitted contacts to seek clarification of threshold issues, under 24 C.F.R. §

4.26(b)(2), because "all aspects" of the threshold must be addressed in the application and

applicant "may not submit additional information to address them once the application is

submitted." In other words, a request for additional information would not be "consistent with

[the] regulatory requirements" of the NOFA. 24 C.F.R. § 4.26(b)(2). Plaintiffs ignore this real

NOFA mandate for themselves (i.e., to address all threshold aspects) in lieu of attempting to

create one for HUD to seek additional threshold information.

Secondly, this ICDBG application requirement, contrary to plaintiffs' claim,

demonstrates that threshold issues, like CBDO status, are "substantive content" of an ICDBG

application. If these threshold issues were not considered "substantive content," the provision

certainly would not have stressed the importance of addressing them completely in the initial

application or advised that applicants "may not submit additional information to address them

once the application is submitted." In fact, if the threshold issues were not considered

substantive content of an ICDBG application, this ICDBG application requirement would not

exist. Therefore, plaintiffs' claim that these thresholds should not be considered substantive is

incorrect.

Contrary to plaintiffs' claims, the stated desire of Section V.B.9.a., "not to unreasonably

exclude applications from being rated and ranked," relates to the "proper completion" of

application and not permitting substantive corrections of applications (R. 87-88). That section of the NOFA goes on to provide specific examples of the type of "curable (correctable) technical deficiencies," for which HUD may contact an applicant for "proper completion" of an application. They include "the failure to submit the proper certifications or failure to submit an application signed by an authorized official." (R. 88). These are limited, minor corrections that do not relate to the substantive content of the application. Clearly, advising NVA of what it needed to demonstrate AHA's eligibility as a CBDO would have overstepped these limitations and moved from seeking clarification for the "proper completion" of application to coaching an applicant in how to improve the substantive quality of its application. Such contact was not mandated and would have been improper.

Unless plaintiffs are suggesting that NVA should have received preferential treatment in violation of the HUD Reform Act, their arguments, followed to their logical conclusion, would result in no ICDBG application ever being rejected for failure to meet a threshold requirement. Instead, HUD would be obligated in every instance to seek information and clarification until all threshold issues were resolved. Such a requirement would place an unreasonable burden on HUD when the NOFA clearly places the burden to address thresholds on the ICDBG applicant. Moreover, it would make the application due date meaningless since application could be revised and re-submitted throughout the evaluation process.

II.    HUD FOLLOWED ITS REGULATIONS AND THEREFORE DID NOT
       VIOLATE NVA'S DUE PROCESS RIGHTS

In addition to NVA's claim that HUD failed to properly credit AHA's CBDO eligibility, they also claim that HUD violated the NOFA and 24 C.F.R. § 4.26(a)(1) and (b)(2) by rejecting

NVA's application without providing notice and allowing NVA an opportunity to correct it, thereby violating NVA's Fifth Amendment due process rights.

Putting aside any arguments on whether merely submitting an application establishes a protected interest requiring due process, plaintiffs' argument in this regard solely rests on the premise that HUD violated its regulations by incorrectly concluding that NVA's application failed to demonstrate AHA's CBDO eligibility and by failing to give NVA an opportunity to correct. As described in detail above, HUD did not violate its regulations in these regards when it acted on NVA's application. Accordingly, plaintiffs' premise fails and no due process rights were violated on the grounds of regulatory violation.

III.    HUD'S REJECTION OF NVA'S APPLICATION WITHOUT NOTICE AND
        HEARING DID NOT VIOLATE NVA'S DUE PROCESS RIGHTS

Plaintiffs assert that HUD's rejection of NVA's ICDBG application, for not providing adequate support for AHA's CBDO eligibility, without notice and an opportunity for hearing violated NVA's due process rights.

        a.    NVA Has No Protected Property Interest In Merely Submitting An
              ICDBG Application

Plaintiffs claim that NVA has a protected property interest in its application under the HCDA and the ICDBG regulations. HUD submits that NVA, by merely submitting an application, does not have a protected property interest.

The test for identifying a property interest sufficient to merit invoking the Due Process clause is not clearly defined. Pence v. Kleppe, 529 F. 2d 135, 141 (9th Cir. 1976). The United States Supreme Court has held:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Submitting an application in a competitive grant program like the ICDBG NOFA establishes no legitimate claim of entitlement and, thus no protected property interest. Indeed, "[the Supreme Court has] never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment." Lyng v. Payne, 476 U.S.926, 942 (1986), citing, Walters v. National Assn. of Radiation Survivors, 473 U.S. 305, 320, n. 8 (1985). The cases plaintiffs cite as examples of courts upholding a legitimate claim of entitlement protected by the Due Process Clause for an "applicants for benefits" are not analogous to this case. Instead they are more akin to termination of benefits. In Goldberg v. Kelly, 397 U.S. 254 (1970), state and city officials were "terminating" aid to recipients of Aid to Families with Dependant Children. In Pence v. Kleppe, 529 F. 2d 135 (9th Cir. 1976), the court held Native Alaskans who occupied and used land for five-year period in manner specified in land allotment statute and regulations relied on their continued right to such land and had property interests entitled to due process protection. In these cases, a government body threatened to terminate a benefit (financial aid and use of land) already enjoyed by the litigant. In this case, HUD did not terminate ICDBG funding to NVA or take away continuing right NVA

had to apply for ICDBG funds. It simply rejected an application for NVA's failure to comply with the requirements of the NOFA and HUD regulations to demonstrate AHA's CBDO eligibility.

In Ressler v. Pierce, 692 F.2d 1212, 1214-16 (9th Cir. 1982), the Ninth Circuit held that applicants have a constitutionally protected property interest in Section 8 benefits entitling them to procedural safeguards in the application and tenant-selection process. The Ninth Circuit based its holding on two factors. First, the court stated that private owners of Section 8 housing "ha[ve] only limited discretion in the Section 8 application and selection process." Id. at 1215. The court distinguished a prior case, City of Santa Clara v. Andrus, 572 F.2d 660 (9th Cir.1978), cert. denied, 439 U.S. 859 (1978), that had found no protected property interest, on the ground that, in City of Santa Clara, the entity charged with dispensing the governmental benefits had "unbridled discretion" in the selection process. 692 F.2d at 1215. In contrast, although apparently conceding that the statute itself imposed no limitations, the Ressler court stated that the regulations and HUD Handbook guidelines "closely circumscribe an owner's discretion" in the Section 8 tenant-selection process. 692 F.2d at 1215. Second, the Ressler court found a property interest in Section 8 benefits "by virtue of [an applicant's] membership in a class of individuals whom the Section 8 program was intended to benefit." Id.[25] The case before the court is distinguishable from Ressler and is more analogous to City of Santa Clara because HUD has unbridled discretion with respect to determining whether an applicant has demonstrated that an entity is sufficiently similar to an eligible CBDO.

---

[25] Subsequently, the Seventh Circuit, in Eidson v. Pierce, 745 F. 2d 453, 460 (7th Cir. 1984), and Eighth Circuit, in Hill v. Group Three Housing Dev. Corp., 799 F.2d 385, 391 (8th Cir. 1986), have rejected the notion that Section 8 applicants possess a property right simply by virtue of their membership in a class.

In City of Santa Clara, the city brought action against Secretary of Interior challenging Secretary's decisions to withdraw hydroelectric power from the city and to deny it an allocation of nonwithdrawable power. The Court held the city, which was a preferred entity under Section 9(c) of Reclamation Act of 1939, 43 U.S.C.A. § 485h(c), had no due process entitlement to, and thus no property interest in, electricity generated by reclamation project as against other preferred entities, in view of fact that Secretary of Interior was free to allocate total power output of reclamation project to other preference users, and was not required to justify his decision to discriminate against some preference entities in favor of others. 572 F.2d at 675-676.

In this case, Plaintiffs have admitted that AHA does not meet the criteria of 24 C.F.R. § 1003.204(c)(1) and is, therefore, not an eligible CBDO under that provision. (M. at 14). AHA is not "tribal-based nonprofit organization," under 24 C.F.R. § 1003.204(c)(2)(iv), because the source of its creation and its base is the Aleutian/Pribilof Island Association, Inc., and the State legislature, which are not an "Indian tribe" under the HCDA. Accordingly, the only provision under which AHA might qualify is 24 C.F.R. § 1003.204(c)(3) if NVA "demonstrates to the satisfaction of HUD" AHA is "sufficiently similar" to an eligible CBDO under the other criteria of 24 C.F.R. § 1003.204(c). This broad standard—demonstration to the satisfaction of HUD—is essentially the same "unbridled discretion" that the City of Santa Clara court noted. In addition, like in City of Santa Clara, nothing in the HCDA, the ICDBG regulations or NOFA require HUD to justify its "satisfaction" with NVA's demonstration. Accordingly, no protected property interest is established here.[26]

---

[26] Moreover, the object of any due process hearing would be absurd. NVA would be hard pressed to prove HUD was, in fact, "satisfied" with its demonstration if HUD claims it was not.

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB                    41

b.    If NVA Has A Protected Property Interest In Merely Submitting An
      ICDBG Application, What Due Process is Due?

Assuming arguendo that merely submitting an ICDBG application establishes a protected

property right, Ressler v. Pierce agreed that the test articulated in Mathews v. Eldridge, 424 U.S. 319

(1976), controls the determination of what process is due. Ressler v. Pierce, 692 F.2d at 1216. In

Mathews the Court stated:

> [P]rior decisions indicate that identification of the specific dictates of
> due process generally requires consideration of three distinct factors:
> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards;   and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335.  Analysis of these factors shows that HUD did not err in

returning NVA's application without prior notice and hearing.

1.  The Private Interest Affected By HUD's Action

If the Court determines that NVA has a sufficient "property" interest in the ICDBG

application process to be entitled to due process protection, according to Ressler v. Pierce, "this

court need not look further at the nature of [NVA's] interest but must focus primarily on its

weight." Ressler v. Pierce, 692 F.2d at 1216, citing, Board of Regents v. Roth, 408 U.S. 564,

570-71 (1972).

Plaintiffs assert that NVA's interest in receiving the grant is great and that there is no

question of the dire need for decent housing "in Akutan and Native villages in general." HUD

does not dispute the need is great in Native Alaska for ICDBG funding, but that need is not

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-RRB               42

unique to Akutan. Indeed, all 39 Alaskan Native Villages that submitted ICDBG applications for the FY 2005 ICDBG NOFA competition for $6,807,990.00 would agree that their needs (mostly in $500,000 requests) are as great if not greater than NVA's needs. (R.1348).

In Ressler, the court noted that it was "undisputable that Ressler, as an applicant for governmental benefits, has less weighty interest than someone who is currently receiving benefits and is threatened with reduction or termination of those benefits." 692 F.2d at 1216. By analogy, NVA's interest in the ICDBG application process, after its application failed to meet threshold requirements because it made little effort to demonstrate AHA's CBDO eligibility, is certainly much less than the interest of the 16 ICDBG Alaska Native village applicants that did adequately address the thresholds, had their applications rated and ranked and were ranked high enough for award.[27] What plaintiffs are asking is that those 16 arguably vested interests be set aside for the sake of NVA being given a second chance to bump one or more off the award list. Such request begs the question of where the second chances and bumping would stop. Would all 23 unsuccessful applicants get a second chance? And would any applicant they displace from the highest rank list, get a second chance?

NVA's interest is no greater than the interest of its competitors it wishes to displace and much less than interests in cases like Goldberg v. Kelly, 397 U.S. 254 (1970), where state and city officials were "terminating" aid to recipients of Aid to Families with Dependant Children; and Pence v. Kleppe, 529 F. 2d 135 (9th Cir. 1976), where Native Alaskans who occupied and

---

[27] HUD awarded 16 ICDBG grants in the FY 2005 funding cycle. (R. 1348). 24 C.F.R. § 1003.301(b) requires that "NOFAs . . . define and establish weights for selection criteria." The NOFA provides that all applications that pass the threshold screening process will be rated on a point scale and ranked "against each other according to the point totals they receive . . . ." See Section V (R. 80-88).

used land for years are being denied a right to stay. NVA can submit an application in the next funding cycle.

    2.  The Risk Of An Erroneous Deprivation Of Such Interest Through The Procedures Used By HUD, And The Probable Value, If Any, Of Additional Or Substitute Procedural Safeguards

Plaintiffs claim that HUD's procedures create a high risk of deprivation because there is no opportunity to correct an application. Plaintiffs assert that the immense value of additional safeguards is clear and include the "exercise of HUD's trust responsibilities to Indian tribes."

Again, it is important to remember that only Indian tribes can apply and compete against each other under the ICDBG NOFA. (R. 74). So when HUD offers NVA a second chance to provide information on a threshold issue that the NOFA specifies must be addressed completely in the application, it is depriving another Native village applicant that did address it completely from reaping the rewards of its compliance.

In reality, NVA was given ample due process. The regulations and NOFA specify the criteria for the CBDO eligibility threshold and the NOFA goes on to require the applicant to "[b]e specific to address all aspects of each relevant criterion and thresholds. . . since you may not submit additional information to address them once the application is submitted." 70 Fed. Reg. 13,684 (emphasis in original) (R. 101). HUD held two workshops on April 19 and 28, 2005, in which material was presented and questions could be asked and answered in a uniform manner (R. 334-506 and 508-512). In addition, after the application had been returned for failure to meet the threshold, NVA was advised of why it failed to meet the threshold so that, in future applications, it may be successful. (R. 812). NVA then submitted a request to reconsider.

(R. 818-823). HUD responded, to the extent permitted by the HUD Reform Act, and answered NVA's claims (R. 824). NVA was advised in that response that the Section VI.A.5 of the NOFA (R. 16) permitted "debriefings" and that HUD staff would be available for such a debriefing (R. 824). Instead of taking advantage of the debriefing, NVA filed suit and sought injunctive relief and HUD, although prepared to oppose the request for injunctive relief because of the hardship it placed on other interested parties (i.e., successful Native villages), stipulated to hold $500, 000 in funds so that this matter could be resolved. NVA now has the Court reviewing HUD's actions with respect to its application. Plaintiffs, however, want more. They want to add another layer or two into the process and have some sort of hearing on whether NVA demonstrated to HUD's satisfaction that AHA was sufficiently similar to qualified CBDOs, along with an opportunity to supplement NVA's application. Even if none is due, NVA has certainly received adequate due process.

While there is no opportunity to correct the failure to meet CBDO eligibility threshold, the probable value of additional or substitute procedural safeguards would be limited. First, NVA can, with the information it now knows, submit an ICDBG application the following funding cycle. The likelihood of its success is greater with the knowledge it gained from this experience. Second, if successful, what plaintiffs are asking for—a second chance—would ultimately not be limited only to threshold issues like CBDO eligibility. Any decision HUD makes in the competition under the ICDBG NOFA would be subject to notice and hearing and an opportunity to correct. If one applicant successfully appeals a decision and disrupts the ranking of other applicants, the disruption of the ranking would be subject to hearing and an opportunity for that applicant that was "bumped" to correct or improve its application. There

would be no need to place threshold requirements, rating factors or even a due date because

applications would be subject to negotiation rather than competition. Moreover, funding cycles

would run into each other because of the delays caused by appeals and litigation involving

review of those appeals. The ICDBG funds would simply not get out to meet the immediate

needs of the Native villages. The results would be burdensome, costly and absurd.

### 3. The Fiscal And Administrative Burdens That The Additional Or Substitute Procedural Requirement Would Entail

HUD can only guess how many applicants would seek "to submit additional information"

or "some kind of hearing" before HUD rejected their application. However, imposing such

requirement, as noted above, could be unduly burdensome and undoubtedly costly in a

competitive grant program. As the Supreme Court acknowledges:

> We only need say that experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial.
>
> Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost.

Matthews, 424 U.S. at 347-348. Unlike plaintiffs' example of Pence v. Kleppe, supra,

where the applications were for land the applicants had already occupied for five years, the

ICDBG NOFA competition is a more nebulous program. There may only be a limited number

of persons that can occupy the same piece of land for the five-year period; however, there can be

39 or more ICDBG applicants jockeying for position in award rankings for a limited amount of

funds. As described above, providing hearings and second chances for substantive threshold

issues would ultimately lead to due process hearings and opportunities to correct every decision

HUD makes in the competition under the ICDBG NOFA. A ruling requiring such would

certainly not be limited to Alaska, but have a national affect on the ICDBG NOFA program.

While HUD's Alaska Office of Native American Programs reviewed 39 applications in FY 2005

(R.1348), HUD has five other Offices of Native American Programs across the nation that each

reviewed a similar number of applications. See Exhibit A, Declaration of Deborah M.

Lalancette. For the FY 2005 ICDBG NOFA, HUD received a total of 204 ICDBG applications.

Id. Although five of the six Offices of Native American Programs have completed their

evaluations and 65 grants have been awarded, the final number of ICDBG grants awarded for the

2005 ICDBG NOFA is not available at this time. Id. However, for the FY 2004 ICDBG NOFA,

HUD received a total of 219 applications. Id. Of those 219 ICDBG applications, 107 ICDBG

grants were awarded and 112 applications were either rejected for not meeting prescreening

requirements or did not rate high enough to receive a grant. Id. A ruling requiring due process

hearings and opportunities to correct for potentially 112 or more applications each year would

clearly expand the administrative burden HUD's limited staff already has in reviewing and rating

hundreds of applications in these ICDBG competitions. In Alaska and each of the other Offices

of Native American Programs, such requirement would certainly disrupt the ranking of

applications and would undoubtedly delay the funding of worthy projects. The ultimate

additional cost in terms of money, administrative burden and delay would not be insubstantial

and would certainly outweigh any benefit from adding to the considerable due process protection that NVA has already received in this competitive process.

CONCLUSION

For the forgoing reasons, the defendants request that the Court deny plaintiffs' motion for summary judgment and dismiss this case with prejudice.

Respectfully submitted this 24th day of March, 2006.

DEBORAH M. SMITH
Acting United States Attorney

s/Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: richard.pomeroy@usdoj.gov
AK #8906031

Of Counsel:

Gary A. Nemec
District Counsel
U.S. Department of
Housing and Urban Development

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2006,
a copy of the foregoing DEFENDANTS'
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
was served via US Mail on the following:

James F. Vollintine
P.O. Box 113329
Anchorage, AK 99511-3329

and

Daniel M. Duame
4000 Old Seward Highway, Suite 202
Anchorage, AK 99503


s/Richard L. Pomeroy

Native Village of Akutan, et al. v. Jackson, et al.
Case No. 3:05-cv-284-TMB