James F. Vollintine
P.O. Box 113329
Anchorage, AK 99511-3329
(907)346-4446; Fax 346-4898
Email: jfv@alaska.com
Attorney for Plaintiffs

Daniel M. Duame
4000 Old Seward Highway, Suite 202
Anchorage, AK 99503
(907)563-2146; Fax 770-6223
Email: Dand@aleutian-housing.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF AKUTAN dba AKUTAN TRIBAL COUNCIL and ALEUTIAN HOUSING AUTHORITY, <br><br>    Plaintiffs, <br><br>vs. <br><br>ALPHONSO JACKSON, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br>    Defendants. | Case No. 3:05-CV-00284-RRB <br><br><br> PLAINTIFFS' REPLY BRIEF |

    The plaintiffs, Native Village of Akutan dba Akutan Tribal Council ("NVA") and Aleutian Housing Authority ("AHA"), hereby submit this Reply Brief in response to the Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

ARGUMENT

I.   HUD ERRED IN REJECTING AHA AS NVA's CBDO.

   a.   AHA Is An Eligible CBDO Under 24 CFR 1003.204 (c)(2)(iv) And (c)(3) As A Matter Of Law.

The United States Department of Housing and Urban Development ("HUD") has opted to rely on a strategy of obfuscation and the scattering of "red herrings" in its opposition brief. For example, HUD spent an inordinate amount of time on the issue of AHA's so-called "flawed bylaws" and its inability to qualify as a CBDO under 24 CFR 1003.204(c)(1). Defendants' Opposition at 16,17,23,24,26,29.[1] However, the plaintiffs' opening brief (p.14) is clear that they do not claim that AHA is eligible under (c)(1) and HUD dwelling on this section is simply misleading and misguided.

The parties agree that there are three independent paths to CBDO eligibility: the Indian tribe, NVA, can designate a CBDO that qualifies under 24 CFR 1003.204 (c)(1),(2) or (3). The plaintiffs contend that AHA qualifies as a matter of law under both (c)(2)(iv) and (c)(3).

   1.   AHA Is An Eligible CBDO Under 24 CFR 1003.204(c)(2)(iv).

---

[1] In their opening brief (p.15, n.3) the plaintiffs pointed out that HUD approved an identical housing authority, Bristol Bay Housing Authority, as a tribe's CBDO and that its bylaws are essentially identical to AHA's and lack the same criteria that HUD found wanting in AHA's. HUD failed to respond to this point yet repeatedly attacks AHA's bylaws.

Plaintiffs maintain that AHA is an eligible CBDO because it is a "tribal-based nonprofit organization" under 24 CFR 1003.204(c)(2)(iv).  HUD's *sole defense* is that AHA is not "tribal-based" because the entity that appoints its board members, the Aleutian/Pribilof Islands Association, Inc. ("A/PIA"-formerly the Aleut League), is not an "Indian tribe."[2] HUD's position is erroneous for a number of reasons.

First, there is absolutely no logic in arguing that the establishment of *Native* housing authorities by the State of Alaska under AS 18.55.996(b) somehow precludes them from being "tribal-based."  State creation does not in any logical way preclude an entity from being tribal-based, particularly when many state-created entities, such as A/PIA, are considered "tribal organizations" under federal law.

HUD totally confuses the distinction between "Indian tribe" or "tribal organization" and "tribal-based." HUD correctly notes that there is no definition of "tribal-based" in the ICDBG regulations.  Def. Opp. at 18. It then, however, makes the unfounded leap that somehow either A/PIA or AHA must be defined as a "tribe" to be "tribal-based."  It asserts that AHA cannot be "tribal-based" because A/PIA is not defined as an Indian tribe under various statutes, including the Indian Self-Determination and Education Assistance Act ("ISDEAA"), P.L. 93-

---

[2] HUD does not dispute that AHA is a nonprofit organization.

638, 25 U.S.C. 450 *et seq.* There is no basis in law, practice or common understanding for this interpretation.

The fact of the matter is that both A/PIA and AHA are 100% tribal-based by any reasonable definition, and have been recognized as such by both the state and federal governments for more than the past quarter of a century. HUD failed to recognize that although A/PIA is not an "Indian tribe" it is a "tribal organization" that acts on behalf of Indian tribes.

The ISDEAA not only defines "Indian tribe," it also defines "tribal organization":

> "tribal organization" means the recognized governing body of any Indian tribe; *any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body* or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of activities;. . .

25 U.S.C. 450b(l) (emphasis added).

Based on its status as a "tribal organization" under the ISDEAA, A/PIA has proceeded to contract and "compact" considerable federal funds on behalf of its member tribes and provides a broad range of health, social and community services.[3]  Since 1992 A/PIA has had an independent "Compact of

_____
[3] A/PIA is made up of the federally recognized tribes of the Aleutian/Pribilof Islands "identified service area," as defined by ANCSA, 43 U.S.C. 1606(a)(8). Each tribe appoints one tribal member to A/PIA's Board of Directors. Pl. Mot. at Ex.A-2.

Self-Governance" directly with the Department of Interior, on behalf of its member tribes, pursuant to Title IV of the ISDEAA, 25 U.S.C. 458aa *et seq.*[4]  The Compact states in part as follows (Ex.A-3):

> This Compact is to enable the United States
> to maintain and improve its unique and
> continuing relationship with and
> responsibility to *the Signatory* and the
> participating tribes through tribal self-
> governance, which will allow such tribes to:
> take their rightful place in the family of
> governments in the federal constitutional
> system; remove federal obstacles to
> effective self-governance; reorganize tribal
> government programs and services; achieve
> efficiencies in service delivery; and
> provide a documented example for the
> development of future Federal Indian policy.
> . . . In fulfilling its responsibilities
> under the Compact, the Secretary hereby
> pledges that the Department will conduct all
> relations with the participating tribes on a
> government-to-government basis, *recognizing*
> *that such tribes may act collectively*
> *through the Signatory*.  (Emphasis added.)

This Compact is accompanied by an "Annual Funding Agreement" (Ex.B) which in FY 2006 will allow for the transfer to A/PIA of approximately 3 million dollars in federal funds for the provision of services to its member tribes and individual tribal members.

A/PIA is also a "tribal organization" under HUD's ICDBG regulation at 24 CFR 1003.5(b):

---

[4] To administer programs and services under an ISDEAA Title IV compact, tribes must also be eligible to contract under Title I, 25 U.S.C. 450 *et seq.* For present purposes, Title I and Title IV are essentially equivalent.

> Tribal organizations which are eligible
> under Title I of the Indian Self-
> Determination and Education Assistance Act
> may apply on behalf of any Indian Tribe,
> band group, nation, or Alaska native village
> eligible under that act for funds under this
> part when one or more of these entities have
> authorized the tribal organization to do so
> through concurring resolutions. . . Eligible
> tribal organizations under Title I of the
> Indian Self-Determination and Education
> Assistance Act will be determined by the
> Bureau of Indian Affairs or the Indian
> Health Service, as appropriate. (Emphasis
> added.)

More critically, the Bureau of Indian Affairs has indicated

that Regional Native Housing Authorities such as AHA

*independently* qualify as "tribal organizations" under Title I

of the ISDEAA, if authorized by one or more tribal governments.

As Assistant Regional Solicitor for the Department of the

Interior Roger L. Hudson states (Ex.C-2):

> If in practice [AHA's] Commissioners are in
> fact chosen by the tribal governing bodies,
> then in my opinion it would be fair to
> conclude that the Housing Authority is
> controlled and sanctioned by Indian tribes,
> and that it would therefore qualify as a
> tribal organization under the ISDEAA.
> (Emphasis added.)

AHA's board of commissioners is in fact appointed by A/PIA's

member tribes (Ex.D-2). HUD's argument that AHA is not "tribal-

based" when both A/PIA and AHA meet the definition of "tribal

organization" under both the ISDEAA and ICDBG regulations is

clearly without merit.

In any event, the issue is whether AHA is "tribal-based," not whether it or its parent organization is an "Indian tribe" or "tribal organization." Obviously, a CBDO is not the tribe itself, but must be a separate entity designated by the tribe (NVA). Here AHA's board of commissioners is composed of tribal members appointed by federally recognized tribal governments and ratified by a "tribal organization" (A/PIA) (Ex.D-2); AHA acts as a tribe's (NVA) agent and "Tribally-Designated Housing Entity" under NAHASDA, 25 U.S.C. 4103(21)(b)(ii) (R.534); and AHA's purpose under AS 18.55.996 is to provide housing for tribal members in Native villages. Accordingly, it should be deemed "tribal-based" as a matter of law.

Whether this court should find AHA to be a CBDO as a matter of law under 24 CFR 1003.204(c)(2)(iv), or whether AHA is simply an eligible CBDO, but must in some fashion demonstrate this fact to HUD, is an issue the court is called upon to decide.  NVA maintains that AHA should be declared an eligible CBDO as a matter of law, but that even without such a declaration it clearly can demonstrate, and under the facts of this case has demonstrated, its CBDO eligibility.[5]

To argue as HUD has, however, that AHA simply cannot be a "tribal-based" organization under 24 CFR 1003.204(c)(2)(iv),

---

[5] HUD concedes that "AHA might be an eligible CBDO" and that it just recognized an identical housing authority as one. Def. Opp. at 16, 24-25.

because of its alleged inability to somehow derive such status through the regional Native nonprofit that appoints its Board, is wrong on its face, and, as demonstrated above, totally unsupported by law, regulation, common sense or practice.

2. The Regulations Do Not Grant HUD "Unbridled Discretion" To Make Arbitrary And Capricious Determinations On What Materials Adequately Demonstrate CBDO Status Under The "Sufficiently Similar" criteria Of 24 CFR 1003.204(c)(3).

Unable to muster any sound legal arguments to defend its position, HUD seeks to persuade the Court that it has "unbridled discretion" to determine CBDO eligibility. There is no logical reason for HUD to interpret the "demonstration" criterion in 24 CFR 1003.204(c)(3) in a manner that places an unreasonably high burden on applicants to demonstrate CBDO status. This is a threshold issue that has no significance or impact on the ultimate merits of a proposed ICDBG project.

As with HUD's analysis of 24 CFR 1003.204(c)(2)(iv), its analysis of 24 CFR 1003.204(c)(3) once again begins with the red herring of AHA's "flawed bylaws" and lack of information to demonstrate eligibility under the eight criteria of 204(c)(1). Def. Opp. at 23. Again, HUD attempts to lead the court down a rabbit trail that is essentially irrelevant.

It is unreasonable and disingenuous to assert that the reviewers were left to "guess" at AHA's eligibility as a CBDO.

Id. at 26.  As stated in plaintiffs' opening brief, HUD has had a 30-year relationship with AHA; knew for a fact that AHA is identical to a previously approved CBDO, Bristol Bay Housing Authority; and had the organic documents in hand (R.555-67) to demonstrate the similarity not only to Bristol Bay, but to the numerous specific organizational criteria listed in the regulations upon which eligibility could be based.  AHA's organic statute and bylaws are not lengthy or difficult documents to read or decipher.

*The reality is that HUD knew at the time NVA's application was submitted, and knows today, that AHA is an eligible CBDO.* The element of "gamesmanship" that HUD has introduced into the process as a result of its determination is unconscionable given the critical housing needs at stake.  This should not have become an issue that resulted in NVA's application being rejected without a review on its merits.  The Court should keep foremost in mind that the CBDO issue is a non-substantive threshold issue – it merely gets an applicant's "foot in the door."  It is not a substantive issue for which points are awarded in rating and ranking an application.

While HUD clearly has some level of discretion in making its determination on whether the various criteria of 24 CFR 1003.204(c) have been met, it is equally clear that the standard is not, and cannot be defined in a manner in which

there is not a range of submissions that could meet the standard. NVA's application may not have met the same standard or level of detail submitted by Bristol Bay, but neither was it so deficient that it failed to meet the standard at all, nor should it have been rejected out of hand. HUD's decision to the contrary was arbitrary and capricious.

If the Bristol Bay submission was the minimum standard HUD was prepared to accept, it should have made this fact known in its training sessions.  HUD had this opportunity and failed to adequately enlighten potential applicants of the apparent hurdle they were facing or the precise information it was looking for.  This is patently unfair.  As stated above, if the deference standard contains any element of fairness and equity the court should not find that "hiding the ball" in this manner is an acceptable or equitable approach in administering a federal grant program.

The cases cited by HUD at pages 25-26 of its brief are inapposite. Even though 24 CFR 1003.204(c)(3) grants HUD discretion in determining whether an entity is "sufficiently similar" to a (c)(1) or (2) entity, it is clear that HUD abused its discretion because AHA is not only "sufficiently similar" it is "substantially similar" to a (c)(1) or (2) entity. Court's do not defer to agency decisions if the agency abused

its discretion. <u>See</u>, <u>e.g.</u>, <u>Jara-Navarrete v. I.N.S.</u>, 813 F.2d 1340, 1342 (9th Cir. 1986).

  3. <u>HUD's Interpretation Is Not Entitled to Deference.</u>

  HUD contends that its interpretation of 24 CFR 1003.204(c) is entitled to deference, Def. Opp. at 27, but as noted above, courts do not defer to agency decisions if the agency abused its discretion. Here HUD plainly abused its discretion in determining that AHA is not "tribal-based" under 204(c)(2)(iv), or "sufficiently similar in purpose, function, and scope" under (c)(3) to a (c)(1) or (c)(2)(iv) entity.

  HUD asserts that AHA did not demonstrate to its satisfaction that it is sufficiently similar to a (c)(1) or (2) entity, yet concedes that it is "intimately familiar" with AHA. Def. Opp. at 27, 31. Thus, HUD is intimately familiar with AHA's "purpose, function, and scope."[6] Additionally, HUD just approved an identical housing authority as a CBDO under (c)(3). <u>Id.</u> at 24-25. Moreover, AHA's "purpose, function, and scope" is set out in AS 18.55.996 and exists as a matter of law. NVA's application included this statute as well as its bylaws and a narrative statement (R.555-67). HUD's position is a clear error of judgment.

---

[6] HUD's concession that it is "intimately familiar" with AHA is a reversal of its position while reviewing NVA's application where it feigned ignorance of AHA (R.816-17).

HUD argues that the canon of construction that statutes and regulations benefiting Native Americans should be liberally construed in their favor is inapplicable because its interpretation is owed deference, citing 3 cases holding that the Secretary of Interior is owed deference in interpreting ANCSA. Def. Opp. at 28.[7] HUD cited no case holding that its own interpretation of regulations benefiting Indian tribes is entitled to deference. Conversely, the plaintiffs cited several federal appellate court decisions holding that the trust relationship requires federal agencies to liberally interpret such regulations in the tribes' favor. Pl. Mot. at 17-18, n.4.

HUD concedes that it owes trust responsibilities to NVA, but states that it owes trust responsibilities to all ICDBG tribal applicants, and "the issue is not whether Native Americans will receive ICDBG funding, but which Native Americans will receive it," citing Chugach Alaska Corp. v. Lujan, 915 F.2d 454, 457 n.4 (9th Cir. 1990). Chugach is not on point. HUD owes trust responsibilities to each tribe to adjudicate its ICDBG application in a fair and just manner. Moreover, CBDO status under 24 CFR 1003.204(c) is merely a threshold issue. Liberally construing the regulations in NVA's

---

[7] None of those cases involved Indian tribes like NVA that are recognized under the Federally Recognized Tribes List Act of 1994, 25 U.S.C. 479a, as having a "government-to-government relationship with the United States." See 70 Fed. Reg. 71194-98 (Nov. 5, 2005).

favor would not have disadvantaged other tribes, but simply allowed its application to be rated and ranked with theirs.

b.    HUD Erred In Determining That NVA Failed To Submit Sufficient  Evidence Of AHA's CBDO Status.

HUD's analysis once again begins with the red herring of AHA's "flawed bylaws" and ineligibility under 204(c)(1). Def. Opp. at 29. AHA submitted a narrative statement, a copy of its organic charter, AS 18.55.996, and its bylaws with its application (R.555-67). HUD concedes that it is "intimately familiar" with AHA, but states that it would be unfair to the other applicants to apply its "intimate knowledge." Id. at 31. This is simply a failure of an agency to apply its knowledge and expertise in adjudicating an application. Because AHA's legal status and scope of activities is defined by law under AS 18.55.996, and because HUD is intimately familiar with AHA based on a 30-year relationship, its decision that NVA failed to submit sufficient evidence of AHA's CBDO status is unreasonable and an abuse of discretion.

c.    HUD Misconstrued Section 103 of the HUD Reform Act of 1989 and Violated 24 CFR 4.26(a)(1) And (b)(2) By Failing To Render Technical Assistance To NVA.

HUD's arguments on Section 103 of the HUD Reform Act, 42 U.S.C. 3537a, and the implementing regulations in 24 CFR Part 4 mischaracterize NVA's position. For example, it states that:

> [A]dvising NVA of what it needed to
> demonstrate AHA's qualifications as a CBDO
> would have overstepped the limitations on
> permissible contacts during the selection
> period and moved from seeking clarification
> to coaching an applicant in how to improve
> the substantive quality of its application.

Def. Opp. at 31,37. While this passage is a correct statement of the prohibitions of 24 CFR 4.26, it misstates NVA's arguments. NVA has never alleged that HUD should have "coached" it or told it *how* to correct its application, but only that under 24 CFR 4.26(a)(1) and (b)(2) the agency should have notified the tribe of a perceived problem that needed correction and allowed it to submit additional information on a threshold, non-substantive issue. Pl. Mot. at 26-30.

HUD states that "[t]o advise NVA of its failure to meet the CBDO threshold requirements and allow it to submit additional information would be coaching NVA in the substantive contents of their [sic] applications [sic] and giving NVA an unfair competitive advantage." Def. Opp. at 35. This statement is a clear example of HUD's misconception of the law, because by notifying NVA of an alleged problem with CBDO status and allowing submission of additional information HUD would simply have complied with 24 CFR 4.26(a)(1) and (b)(2).

HUD implies that the only technical assistance it may give is notifying potential applicants under 24 CFR 4.26(a)(1) of unpublished policy statements and program requirements "on a

uniform basis," and that its two training sessions satisfied this requirement. Def. Opp. at 33. But providing technical assistance "on a uniform basis" satisfies only part of the regulation, which goes on to say that HUD may notify individual applicants of substantive defects in their applications.[8]

The plaintiffs pointed out in their opening brief (pp.28-29) that CBDO status is not a substantive issue because it is not a rating factor. Assuming *arguendo* that it is a substantive issue, 24 CFR 4.26(a)(1) expressly authorizes HUD employees, "during the selection process," to notify an applicant "of those parts of an application that need substantive improvement," but prohibits advising how to make them. HUD concedes that the plain language of the regulation supports the plaintiffs' interpretation, but states that it interprets the regulation as authorizing it to give technical assistance only "before deadline of submission of applications." Def. Opp. at 33. HUD's interpretation is erroneous in several respects.

First, incredibly, HUD states that it relies on *repealed* language that is not part of 24 CFR 4.26(a)(1). Id.  The old regulation, 24 CFR 4.105, stated that "[b]efore the deadline

---

[8]Additionally, 24 CFR 4.26(b)(2) authorizes HUD to "contact an applicant for the purpose of clarification of the applicant's application" and states that "clarification...may include a request for additional information consistent with the regulatory requirements." Here seeking clarification would not have equated with submission of additional information because HUD had all the necessary information in hand.

for the submission of applications, the term 'technical assistance' may include identification of those parts of an application that need substantive improvement..." (Emphasis added.) See 57 Fed. Reg. 34246, 34249 (Aug. 4, 1992). This language was deleted from the current 24 CFR 4.26(a)(1). Thus, under the previous regulation HUD could render technical assistance only before the deadline for submission of applications. The obvious intention of removing this language was to allow it to render technical assistance after the deadline. It is plainly error for HUD to rely on repealed language in interpreting 24 CFR 4.26(a)(1).

Second, HUD's interpretation that it can give technical assistance only before the application deadline conflicts with the plain language of 24 CFR 4.26(a)(1)that it may do so "during the selection process." Under 42 U.S.C. 3537a(e)(6)the term "selection process" means the period that begins with the development and preparation of a NOFA "and concludes with the selection of recipients of assistance, and includes the evaluation of applications." (Emphasis added.) See also 24 CFR 4.22 ("The [selection] period includes the evaluation of applications...") Thus, HUD was plainly free to contact NVA while evaluating its application and notify it of an alleged substantive defect and permit it to correct it.

HUD next cites its General Counsel's opinion that HUD cannot contact applicants regarding alleged substantive defects; section V.B.9.a of the NOFA that states that "HUD may not seek clarification of items or responses that improve the substantive quality of your response to any rating factor"; and another NOFA section that states that applicants "may not submit additional information to address [threshold issues] once the application is submitted." Def. Opp. at 34-36. All of these are simply misstatements of the law because under 24 CFR 4.26(a)(1) HUD is clearly authorized to notify an applicant "of those parts of an application that need substantive improvement" although it cannot advise how to make the improvement, and under 4.26(b)(2) it may seek clarification of an application and elicit additional information.

As previously noted, HUD has misinterpreted 24 CFR 4.26(a)(1) and (b)(2) as authorizing it to give technical assistance only "before deadline of submission of applications," when these regulations plainly authorize it to do so while evaluating them after the deadline. This misinterpretation is reflected in the NOFA (R.101) which states that applicants "may not submit additional information" to address threshold issues such as CBDO status. Def. Opp. at 35. HUD then argues that eliciting further information under 4.26(b)(2) is discretionary, that the NOFA informs applicants

that HUD will not exercise such discretion, and that the NOFA language is binding on NVA. Id. at 36.

HUD's reasoning is flawed for several reasons. First, the NOFA language is based on its misinterpretation of the regulations. Even though 24 CFR 4.26(a)(1) and (b)(2) are couched in permissive rather than mandatory terms, HUD has plainly misinterpreted them as completely precluding it from notifying applicants of substantive defects after the application deadline. Accordingly, the NOFA language prohibiting submission of additional information is invalid because it is based on HUD's faulty interpretation of the underlying regulations.

Moreover, while eliciting information under the regulations might be discretionary on a case-by-case basis, the NOFA language prevents HUD from exercising _any_ discretion.  NVA submits that HUD erred in precluding itself from exercising its discretion under the regulations to seek clarification and notify NVA "of those parts of an application that need substantive improvement." See, e.g., Independence Min. Co., Inc. v. Babbitt, 105 F.3d 502, 507 n.6 (9th Cir. 1997) (even if agency's actions are discretionary it cannot simply refuse to exercise its discretion); Jara-Navarrete v. I.N.S., 813 F.2d 1340, 1343 (9th Cir. 1986) (agency erred in abdicating responsibility to make individualized determinations).

In rejecting NVA's application HUD held that Section 103 of the HUD Reform Act, 42 U.S.C. 3537a, prevented it from eliciting further information from NVA (R.825). This was clearly an error of law because 24 CFR 4.26(a)(1) and (b)(2) expressly authorize it to do so. As noted above, HUD's interpretation of these regulations is based on repealed language and contrary to their plain language. "[T]he plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted only when the regulation's language is ambiguous." <u>Wards Cove Packing Corp. v. National Marine Fisheries Service</u>, 307 F.3d 1214, 1219 (9th Cir. 2002); <u>Lal v. I.N.S.</u>, 255 F.3d 998, 1004 (9th Cir. 2001). Plaintiffs submit that HUD's interpretation is invalid because it is contrary to the regulations' plain meaning.

II. <u>HUD's Failure To Follow Its Regulations Violated NVA's Due Process Rights</u>.

HUD declined to discuss the merits of NVA's argument on this issue and simply asserts that it did not violate the regulations. Def. Opp. at 37-38. Accordingly, the Court should rule in NVA's favor on this issue if it holds that HUD violated its regulations.

III. <u>HUD's Rejection Of NVA's Application Without Notice Or Hearing Violated NVA's Due Process Rights</u>.

a. <u>NVA Has A Protected Property Interest In Its ICDBG Application</u>.

HUD states that:

> The object of any due process hearing would
> be absurd. NVA would be hard pressed to
> prove HUD was, in fact, "satisfied" [that
> AHA is "sufficiently similar" to a CBDO
> under 24 CFR 1003.204(c)(3)] with its
> demonstration if HUD claims it was not.

Def. Opp. at 41, n.26. But HUD has acknowledged that "AHA might be an eligible CBDO" though not as a matter of law, and that it recognized an identical housing authority as one. Id. at 16, 24-25. NVA submits that a hearing would enable it to present factual information and legal arguments on AHA's CBDO status that would indeed persuade HUD that AHA qualifies as a CBDO.[9]

HUD argues that NVA does not have a protected property interest by merely submitting an application, which it has "unbridled discretion" to reject. Def. Opp. at 38-41. The Ninth Circuit rejected HUD's similar arguments in Ressler v. Pierce, 692 F.2d 1212 (9th Cir. 1982), and upheld the Alaska District Court's decision that applicants for Section 8 benefits must be afforded due process protections in the application and selection process. The court distinguished Board of Regents v. Roth, 408 U.S. 564 (1972), and City of Santa Clara v. Andrus, 572 F.2d 660 (9th Cir. 1978), because the agencies there had

---

[9] HUD does not dispute that its position on whether its procedures comply with due process is not entitled to deference. See Ramirez-Alejandre v. Ashcroft, 320 F.3d 858, 869 (9th Cir. 2003).

"unbridled discretion" in the application and selection process. Id. at 1215.

The court noted that the owners of the private housing had only limited discretion in the Section 8 application and selection process and further that HUD had promulgated detailed guidelines for Section 8 applicants. The court found an additional ground for affording due process protections: the applicants' "membership in a class of individuals whom the Section 8 program was intended to benefit" under 42 U.S.C. 1437f(a)(1978). Id. at 1215-16.

HUD does not have "unbridled discretion" in determining an entity's CBDO status as it asserts, but instead must follow the standards in 24 CFR 1003.204(c). NVA has alleged that AHA qualifies as a CBDO under (c)(2)(iv) or that it is "sufficiently similar" under (c)(3) to a (c)(1) or (c)(2)(iv) entity to qualify as one. Pl. Mot. at 8-16. HUD must consider these standards and plainly does not have "unbridled discretion" to determine CBDO status. Finally, like the Section 8 applicants in Ressler, NVA falls squarely within the class of applicants that the ICDBG program was intended to benefit. See 42 U.S.C. 5301 and 24 CFR Part 1003. Accordingly, it has a protected property interest in its ICDBG application.

    b.   Determining What Process Is Due.

        1.   The Private Interest

<u>Affected By HUD's Actions.</u>

HUD concedes that NVA has as great a need for decent housing as the other 38 ICDBG applicants, but contends that because NVA's application was rejected it has a less weighty interest than the 16 applications that were approved, which it describes as "arguably vested interests" that could be set aside if plaintiffs prevail herein. Def. Opp. at 43. This argument is erroneous and has no bearing on the dire need for housing in Akutan village.

First, although it is true that HUD approved 16 ICDBG applications and used up all FY 2005 ICDBG funds, the parties stipulated to HUD setting aside sufficient *unused FY 2004 ICDBG funds* to satisfy NVA's application should it eventually prevail herein and in further proceeding before the agency. <u>See</u> Stipulation and Order, Dec. 14, 2005. Thus, no approved ICDBG application would be set aside if plaintiffs prevail.

Second, HUD inaccurately describes the effect of granting NVA a hearing on CBDO status and unreasonably assumes that it would have obligated all ICDBG funds during the process. As pointed out in NVA's opening brief, during the hearing process HUD could simply have set aside enough funds to satisfy NVA's application and obligated or distributed the remainder to the successful applicants. Only 1 or 2 applicants at the bottom of

HUD's rating and ranking list would have been affected by a delay. Pl. Mot. at 42-43.

HUD states that NVA's application is entitled to little weight because it can simply "submit an application in the next funding cycle." Def. Opp. at 44. This would be like the court in Ressler holding that the plaintiff was not entitled to relief because she could file another Section 8 application. Instead, NVA is entitled to have its present application properly adjudicated and it is no defense to argue that it can file another one. Finally, HUD failed to address NVA's argument that its substantial investment in the ICDBG application process strongly militates against arbitrary rejection, and that argument must be deemed admitted. Pl. Mot. at 39-40.

> 2. Risk Of Erroneous Deprivation By
> HUD's Procedures And Probable Value
> Of Additional Safeguards.

It is undisputed that HUD rejected NVA's application without notice or hearing, yet it argues that the tribe "was given ample due process." Def. Opp. at 44. It cites the NOFA language that applicants cannot submit additional information, and states that it held two ICDBG workshops, that it informed NVA why it rejected its application and offered to "debrief" it, and that it responded to NVA's request for reconsideration "to the extent permitted by the HUD Reform Act." Id. at 44-45.

As to the NOFA language, NVA contends that HUD's summary rejection was an abuse of discretion and arbitrary and capricious and violated 24 CFR 4.26(a)(1) and (b)(2) as well as NVA's due process rights. Moreover, the pre-application workshops and post-rejection information given NVA cannot be called due process in adjudicating its application. Nor did HUD consider NVA's request for reconsideration as it suggests. HUD simply declared that its original decision was beyond challenge, and that "judgments made within the provision [sic] of the NOFA and program regulations are not subject to claims of error," and "[o]nly mathematical errors in the rating and ranking may be considered by the agency" (R.825).

3.    HUD's Interest And Cost
      Or Burden On Agency.

HUD argues that allowing applicants to submit additional information and arguments or giving them brief hearings on disputed factual questions would be "burdensome, costly and absurd." Def. Opp. at 46. But as HUD notes, the Supreme Court has held that cost alone is not controlling in determining whether due process protections apply. Id. The plaintiffs submit that this is not a case where the cost or burden on the agency outweighs due process protections.

Indeed, if disputed factual and legal issues are not resolved by the agency, the federal courts must adjudicate them

under the Administrative Procedure Act, 5 U.S.C. 706. It undoubtedly would be less costly and burdensome for HUD to administratively resolve disputed threshold issues such as CBDO eligibility by notice and hearing than litigating them in federal court. The plaintiffs made every possible effort to resolve this matter administratively but were unsuccessful.

CONCLUSION

For the foregoing reasons, and for the additional grounds set out in plaintiffs' opening brief, the plaintiffs respectfully request that the Court grant their motion for summary judgment.

DATED April 10, 2006.

/s/James F. Vollintine_____
P.O. Box 113329
Anchorage, AK 99511-3329
(907)346-4446; Fax 346-4898
jfv@alaska.com
Attorney for Plaintiffs

/s/Daniel M. Duame_____
4000 Old Seward Hwy, Ste 202
Anchorage, AK 99503
(907)563-2146; Fax 770-6223
Dand@aleutian-housing.com
Attorney for Plaintiffs

CERTIFICATE OF SERVICE
I hereby certify that on April
10, 2006 a copy of this document
(Plaintiffs' Reply Brief)
was hand-delivered to:
Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave.,#9,Rm.253
Anchorage, AK 99513-7567

/s/James F. Vollintine